# WALL v. WILLIAMS, USE, &c.

1. It is not allowable to ask of a witness whether an Indian of the Choctaw tribe became a citizen of Alabama after the laws of the State were extended over the Choctaw territory. A direct answer to such a question is a conclusion of law, which the court should decide from the facts proved.

2. Where a deposition contains a question and answer which discloses illegal testimony, it may be objected to on the trial; but where the objection is to the entire deposition, on a ground that it does not question the competency of the witness, the admissibility of the facts disclosed, or show that it had not been taken in conformity to the statutes, it seems that a motion should be made to suppress it before the cause is put to the jury.

3. The 9th section of the act of 1832, which requires that on contracts made with an *Indian*, the consideration shall be proved by two credible wit-

nesses, extends not only to Indians of the full blood, but to the descendants of an Indian woman and a white man.

4. Marriages among the Indian tribes must generally be considered as taking place in a state of nature, and if according to the usages and customs of the particular tribe, the parties are authorized to dissolve it at pleasure, the right of dissolution will be considered a term of the contract; and either party may take advantage of this term, unless it be expressly or impliedly waived by them, or they may perhaps acquire such relations to society as will give permanency to the contract, and take from them the right to annul it.

5. The act of 1832 extending the jurisdiction of this State over the Indian territory does not take from a marriage between members of the Choctaw tribe its dissoluble quality at the pleasure of the parties: nor can the asking a reservation under the treaty of Dancing Rabbit Creek, the acceptance of a patent from the United States for the land embraced by it, and the continued cohabitation in this State for more than five years after the ratification of the treaty, and the departure of the mass of their tribe to the west, have that effect. The concurrence of all these facts will not take from a reservee, his citizenship as a Choctaw—the treaty securing the right of resuming his *status* in the tribe at pleasure: nor will it warrant the assumption that the marriage was consummated in contemplation of a residence in Alabama.

Writ of Error to the Circuit Court of Sumter.

THE defendant in error declared against the plaintiff in assumpsit on a promissory note, dated the 18th October, 1837, by which she promised to pay him on or before the first day of January next thereafter, $133 75. The defendant pleaded —1. Non-assumpsit. 2. That the plaintiff ought not to have and maintain his action, &c. because she says that at the time of making the several supposed promises and undertakings in the declaration mentioned, she was the wife of one David W. Wall, to wit, &c.; and this she is ready to verify, &c. To the second plea, the plaintiff replied that the defendant became the wife of said Wall under the usage and customs of the Choctaw tribe, and while subject to such usage, and in the territory then occupied by said tribe, and before Alabama had extended its jurisdiction over them; and by such usage the wife was entitled to contract as a *feme sole*. That at the time of bringing this action, the said Wall

had abandoned the defendant and left the country, and gone to his tribe without the intention of returning. Whereby the plaintiff avers that by the said usages and customs of said tribe, defendant became a *feme sole*. The defendant rejoined that after the marriage of the parties as aforesaid, according to the Choctaw usages, the said tribe removed west of the Mississippi, and the said Delila and David remained in the said county of Sumter, and became citizens of the State of Alabama, and lived under its laws as man and wife, and have never been divorced. To this rejoinder the plaintiff demurred, and his demurrer was sustained by the court. Thereupon the defendant again rejoined, admitting that the marriage was made as stated in the plaintiff's replication, and traversing the residue. She alledged further, that she became a citizen of the United States under the 14th article of the treaty of Dancing Rabbit Creek, and a citizen of the State of Alabama; and was, and still is the wife of David W. Wall. To this rejoinder the plaintiff also demurred and his demurrer was sustained. An issue was then formed on the replication, and the cause was thereupon submitted to a jury, who returned a verdict for the plaintiff, and judgment was rendered accordingly.

From a bill of exceptions sealed at the defendant's instance, it appears that the defendant lived in the Choctaw nation in 1828, was the daughter of a full blood Indian woman and a Frenchman—Wall was one-fourth Indian, and himself and defendant lived together as husband and wife from 1831 until seven or eight years preceding the trial below; when he killed a man, and to avoid a prosecution, left the county and went to his tribe west of the Mississippi, and has never returned. But defendant has received letters from him, in which he threatened to return and take away her child. Defendant lived in 1842 or '3, where she did in 1828.

Another witness introduced by the plaintiff, stated that he had inquired into and informed himself as to the laws and customs of the Choctaws. The tribe had no written laws. They married and unmarried at pleasure—a man frequently having several wives. When a man found a woman he wished to marry, he made her a present of a blanket and she

became his wife—when he wished to dissolve the marriage, he abandoned her. The husband took no part of the wife's property by the marriage, and she retained all the rights of a *feme sole.*

It was admitted that the defendant and David W. Wall belonged to the Choctaw tribe, and both obtained reservations of land under the treaty of Dancing Rabbit Creek.

The defendant then offered a patent from the United States, dated 18th December, 1842, conveying to herself and children certain lands under the 14th article of the treaty of Dancing Rabbit Creek. She also read the deposition of one Brashear, stating that the marriage of herself and Wall was considered valid in all respects among the Choctaws—the tribe having jurisdiction at that time over the territory where it took place. Parties were sometimes married according to the laws, usages and customs of the Choctaws by a justice acting under the laws of the United States, sometimes by a captain, parson, or merely by consent of parents. That defendant and Wall lived together as man and wife about eight years, until July, 1839, and within half a mile of Moscow, Sumter county, Alabama. The deposition contained a question and answer, to which the plaintiff objected, as follows: "Did or did not the said D. Wall and Delila Wall become citizens of Sumter county, after the laws of the State of Alabama were extended over the Choctaw territory, which now constitutes Sumter county?" *Answer.* "The said David W. and Delila Wall became citizens of Sumter county, Ala." The objection was sustained, the question and answer ruled out, and thereupon the defendant excepted.

The defendant then introduced the deposition of another witness, who stated that he was acquainted with the law of marriage among the Choctaws up to 1833; that they were sometimes married by a minister, sometimes by a Choctaw ceremony, and sometimes a man and woman took each other (without ceremony), lived together and were considered man and wife. Marriages were also solemnized by a justice of the peace from an adjoining county. Witness was acquainted with D. W. Wall from 1823 to 1839, at different places, and at his late residence in Sumter county—the defendant had been known to him since 1829—she then lived at the

same place in Sumter county where she continued to reside up to 1844. Defendant and Wall were considered *husband and wife* by the Choctaws and other persons residing among them; but there was no evidence that they had ever been naturalized according to the laws of the United States in respect to foreigners.

The court charged the jury—1. That the act of 1832, which required the consideration of contracts made with Indians to be proved by two credible witnesses, applied only to contracts made with Indians of the full blood; and consequently did not embrace the present case. 2. That a married woman was incapable of making a contract, so as to make herself liable; that, if the defendant and D. W. Wall were married according to the laws and customs of the Choctaws, the marriage would be regarded as valid in this State; but if by those laws and customs a married woman may contract as a *feme sole*, and she made the note sued on, she was bound by it, and liable for its payment. So, if by those laws and customs, the defendant and D. W. Wall could dissolve the marriage at pleasure by abandonment, and D. W. W. did abandon the defendant and dissolve the marriage before defendant made the note, then she was bound to pay it. That although the marriage might be valid according to the usages of the Choctaws then in force in their nation, yet the wife had the capacity to contract: *provided*, that under the Choctaw laws, she retained her property and the rights of a *feme sole;* and she was liable to be sued as a *feme sole*, if the marriage was dissolved. If the marriage was dissoluble at the pleasure of the husband, its dissolution might be inferred from the abandonment by the husband, and going to his tribe beyond the Mississippi, or elsewhere.

The defendant then prayed the court to charge the jury as follows: 1. If the defendant became a citizen of the United States by the 14th article of the treaty of Dancing Rabbit Creek, the laws and customs of the Choctaws were as to the defendant thereby abrogated, during the time that she continued to reside in this country; and her rights as a married woman became subject alone to the laws of this State and the United States. 2. If the defendant became a citizen of the United States, as supposed by the first prayer, and was

the wife of D. W. W., she was entitled to all the rights, and
subject to all the incapacities of a married woman; and in-
capable in law of making a promissory note that would be
binding upon her.    These charges were refused by the court,
and the jury were further instructed, that the defendant be-
came a citizen of the United States by conquest of the Indian
territory, and by the provisions of the treaty of Dancing Rab-
bit Creek, without herself or her husband ever having been
naturalized.    Yet the citizenship which the defendant thus
acquired did not incapacitate her, if by the laws and customs
of the Choctaw nation under which she became the wife of
D. W. W., she was capable of making a contract.    To all
which rulings, and charges given and refused, the defendant
excepted, &c.

J. HAIR, HOIT, and S. W. INGE, for the plaintiff in error,
made the following points:    1. The rejoinder to the repli-
cation is a good answer to it.    [1 Chit. Plead. 680-1.]    2.
The replication is a *departure* from the declaration, in rely-
ing on usages, customs, &c. of the Choctaws, instead of set-
ting up matter of avoidance at common law.    [1 Chitty's Pl.
681; 2 Saund. Rep. 840; 20 Johns. Rep. 163; 1 Cow. Rep.
319; 14 Mass. Rep. 103.]    *Departure* is matter of substance
reached by general demurrer.    [1 Chit. Pl. 686; 2 Saund.
Rep. 84, note 1; 1 Wils. Rep. 122; 2 Id. 96; 4 T. Rep. 504;
2 Caine's Rep. 320, 329; 16 Mass. Rep. 1; 14 Johns. Rep.
132; 20 Id. 163.]    The replication does not answer the plea
of coverture; [1 Chit. Plead. 612; 8 T. Rep. 545; 15 Mass.
Rep. 31;] and the demurrer should have been visited upon
it.    [1 Chit. Plead. 707; 1 Saund. Rep. 285, note 5; 8 East
Rep. 442; 5 Cranch's Rep. 257; 2 Johns. Rep. 366; 7 Cow.
Rep. 46.]

3. The second rejoinder, filed after the demurrer was sus-
tained to the first, is clearly good—the objection that it con-
tains matter of confession, traverse and avoidance, is only
ground of special demurrer.    [1 Chit. Plead. 515, 642; 1
Saund. Rep. 337, note 3; Com. Dig. Pleader, E. 2; Bac.
Ab. Pleas, K. 1; 1 Bos. & P. Rep. 415; 2 Johns. Rep. 433;
Clay's Dig. 334, § 119.]

4. The act of 1832, which requires the consideration of

contracts made by *Indians* to be proved, applies not only to Indians of the *full blood*, but to those of *mixed* blood also. [Clay's Dig. 272.] The terms of the statute are general, and it should not be limited by construction.

5. The defendant and her husband became citizens of Alabama under the treaty—they received reservations under it, and a patent issued to the defendant. An Indian may be made a citizen by treaty. [Cons. U. S. art. 2, § 2; art. 6; 6 Pet. Rep. 515.] By accepting a patent from the United States, the defendant signified her assent to become a citizen thereof, and Alabama having taken possession of the territory pursuant to treaty, took it with all the incumbrances imposed by the treaty, and cannot deny the citizenship acquired by the Indians under its stipulations. [4 How. Rep. (Miss.) 522, 555, 559 to 563; 2 Yerg. Rep. 421, 428-9, 454; 5 Id. 326 to 329.]

6. The marriage of defendant and D. W. W. was contracted with a view of being continued in Alabama—the six months provided by the treaty for signifying their assent to become citizens of the United States, had previously expired. [Story Confl. of Laws, § 199, 229; 2 Yerg. Rep. 438, 454; 5 Id. 326.] The condition of a married woman is regulated by the law of the domicil. [Story's Confl. of L. § 18 (1), 50 to 55, 64, 66 (a), 69, 70, 103, 181, 187 (5), 189 (7), 190 (8). See also p. 188; 2 Kent's Com. 459.]

7. The abandonment of the defendant by D. W. W., did not dissolve their marriage—such a mode of dissolution is opposed to the laws of this State. [Story's Confl. of Laws, § 221, 222, 223, 224, 225, 189, 226 (a. & b.) 228, 229, 322. See also p. 188, note; 2 Clark & F. Rep. 488, 520.]

8. The objection to the question and answer in Brashear's deposition came too late, at the trial. [9 Ala. Rep. 744.] The last charge given lays down the law incorrectly, in assuming that the defendant became a citizen of the United States by conquest of the Indian territory. [6 Peters' Rep. 515.]

R. H. Smith, for the defendant in error, insisted that the replication was sufficient to avoid the plea of coverture; [2 Kent's Com. 157, note; 3 Ala. Rep. 537; 9 Id. 855;] but

Wall v. Williamson.

the rejoinder does not answer the replication. If there was an abandonment by the husband, it is not necessary that there should have been a divorce. The amended rejoinder is bad on general demurrer; because it confesses, traverses and avoids. [5 Ala. Rep. 490; 7 Id. 17.] But if the demurrers were improperly sustained, the defendant has not been prejudiced. Coverture is admissible under the plea of *non-assumpsit*, (1 Chit. Plead. 469, 470;) and the bill of exceptions shows that proof of it was admitted at the trial. So that the defendant has had the full benefit of his defence, and cannot object to the insufficiency of the replication, or complain that his rejoinders have been adjudged bad. [4 Ala. 230.] The capacity of the defendant to contract, or the effect of her marriage must depend upon the law of the place where she was married. [8 Ala. Rep. 48.] It is apparent from the proof that she was not incapacitated by the marriage; and if she was, her competency we have seen, was restored by the abandonment of her husband.

It is not perceived that the question of citizenship is a material point in this case. But however this may be, it is clear that the treaty did not make her a citizen; it only entitled each Indian who desired to remain and become a citizen, to a reservation of lands, for which, after five years, they might receive a grant. This only conferred one of the rights of citizenship—that of holding lands.

The part of the testimony of Brashears which was excluded was incompetent, and the case from 9 Ala. Rep. 744, does not require an objection to a deposition under such circumstances to be made previous to entering upon the trial. But this question need not be pressed, as the charge of the court proceeded upon the hypothesis that the fact which the rejected answer affirmed, was proved.

The act of 1832 does not apply to an Indian who abandons his tribe and leads a civilized life. It is clearly indicated by the 4th and 9th sections, taken together, that the legislature intended to distinguish between "Indians, and persons of mixed blood descended of Indians."

COLLIER, C. J.—The question proposed by the defend-

105

ant below, to her witness, Brashears, and his answer thereto, were rightly excluded by the circuit court. It is the province of a witness to narrate facts, and for the judge to decide the law arising upon them. But here the inquiry addressed to the witness required him to state, what was the *status* of the defendant and her supposed husband—a conclusion of law depending upon facts; the fact was matter of proof, but the effect of it was·referable to the court. The case of Spence v. Mitchell, 9 Ala. Rep. 744, is unlike the present; there an objection was for the first time made *at the trial*, to the admissibility of a deposition, on the ground that all the questions proposed to the witness were not fully answered. We held, that as the deposition was regularly taken, the witness competent, and the facts disclosed admissible, the motion to suppress came too late. [See also, Carter v. Manning & Jackson, 7 Ala. Rep. 851.] In the case before us, the deposition was not suppressed, but a single question and answer which were in themselves inadmissible, were excluded. It is the duty of the court to protect the jury against the admissions of illegal evidence, when it is objected to, no matter through what medium it is offered.

It is enacted, by the 8th section of the act of 1832, " to extend the jurisdiction of the State of Alabama, over the territory according to the geographical boundaries within the limits of said State, and for other purposes," " that in all cases where the suit is brought on contracts hereafter made, to recover money or property from any Indian, the consideration shall be proved by two credible witnessess. " It is insisted by the counsel for the plaintiff below, and was ruled by the circuit court, that this section applies alone to Indians of full blood. This conclusion is rested upon the assumption that the legislature by using the terms, " Indians, or persons of mixed blood, descended of Indians," in the fourth section, recognized two distinct classes, and as Indians are alone mentioned in the ninth section, those of mixed blood are excluded from its operation. If our legislative acts were drawn with a punctilious regard to exactness of expression, the argument would be more potent; but we all know that the different sections of a statute are not always written by the

same hand, and this will frequently account for a change of phraseology, from general to special terms, and *vice versa*.

The fourth section concedes to "Indians, or persons of mixed blood, descended of Indians," the right to perpetuate testimony, to record "wills, and bills of sale and conveyances, with the testimony of such persons." By the fifth section, white persons living in the Indian country are made subject to the laws applying to white persons living in any other part of the State. The second section authorizes the court of revenue and roads in any county embracing a portion of the Indian territory, to cause such roads, bridges and ferries to be established within the same as the public good requres. By the third section, Indians are exempted from working on the roads, from performing. military duty, and serving on juries ; and it declares that no tax shall be assessed or collected "from any Indian, or person of mixed blood, descended of Indians," residing in this State. The sixth and seventh sections abolish the laws, usages and customs of the *Creek* and Cherokee nations of Indians within this State, contrary to the constitution and laws of the same ; and it is made penal for either of these tribes, by "any Indian or Indians," to meet in council, &c., and make such laws for the government of the same. And the fourteenth section declares, that any contract freely and voluntarily made in writing, &c. whereby any white man shall purchase an improvement, *&c.*, "of any Indian, on any of the unceded territory," &c., "shall be obligatory on the parties to such contract."

We cannot think the general term "Indians," was used in a literal or restricted sense, or intended to indicate a class of persons distinct from "persons of mixed blood, descended of Indians ;" but these latter terms were used *ex majore cautela*, by the draftsman of the section, or the part of it, in which they are found. They are mere expletives, and do not enlarge the operation of the act. The word "Indians," is sufficiently expansive to embrace them. It will not be contended, that the third section, in exempting Indians from the performance of military duty, working on roads, or serving on juries, applies exclusively to those of the *full blood;* or that a Creek or Cherokee of *mixed blood* could not be prosecuted and punished under the seventh section for meeting in coun-

cil, &c., and making laws for the tribe, contrary to the laws and constitution of this State. And there is quite as little pretence that the provisions of the fourteenth section are to be limited to purchases made of Indians of unmixed blood.

In common parlance, the word ".Indians," includes not only those who have no admixture of blood with the white or negro races, but those descendants of Indians who have become thus mixed, yet retain their distinctive character as members of the tribe from which they trace their descent. The treaty with the Choctaws in 1830, gives to "each Choctaw head of a family being desirous to remain and become a citizen of the State," &c. six hundred and forty acres of land; and this has been held to embrace not only Indians of full, but those of mixed blood also.

The object of a requisition upon a party contracting with an Indian, was, in the language of the court of errors of New York, "to save the Indians from falling victims to their own weakness, and to the superior intelligence, and sometimes to the cupidity of the whites." The statute was intended, "as a guard against the imposition and frauds to which that unfortunate race of men are exposed, from their ignorance and mental debasement." [Goodel v. Jackson, 20 Johns. Rep. 720.] The ignorance of the half breed is in general quite equal to that of the Indian whose blood is unadulterated, and certainly requires the same protection for his rights. So far then as the reason of the enactment we are considering is concerned, they both come within its spirit, and we have seen that the language employed is sufficiently comprehensive to embrace them. It therefore follows that the charge of the circuit court, in limiting the operation of the act of 1832, misapprehended the law. [See Pack v. Pack, 9 Por. Rep. 297.]

The 14th article of the treaty referred to, is as follows : "Each Choctaw head of a family being desirous to remain, and become a citizen of the States, shall be permitted to do so, by signifying his intention to the agent within six months from the ratification of this treaty, and he or she shall thereupon be entitled to a reservation of one section of six hundred and forty acres of land, to be bounded by sectional lines of survey; in like manner shall be entitled to one half that

Wall v. Williamson.

quantity for each unmarried child which is living with him over ten years of age; and a quarter section to such child as may be under ten years of age, to adjoin the location of the parent. If they reside upon such lands, intending to become citizens of the States, for five years after the ratification of this treaty, in that case a grant in fee simple shall issue; said reservation shall include the present improvement of the head of the family, or a portion of it. Persons who claim under this article, shall not lose the privilege of a Choctaw citizen, but if they ever remove, are not to be entitled to any portion of the Choctaw annuity." [7 U. S. Statutes, by Peters, 335.] It would perhaps have been more correct if the treaty had employed the term *inhabitant* or *resident* instead of "citizen of the States," as Indians cannot, consistently with the constitution and laws, be invested with all the rights, and bound to all the duties of citizens. But no consequence can result from the inaccurate use of a word in this instance; for the reservee who resided upon his reservation for five years after the treaty was ratified, intending to *become a citizen*, &c., was entitled to a grant in fee simple: yet by his claim of land he was "not to lose the privilege of a Choctaw citizen." Having obtained a title to his reservation, he could sell or abandon it at pleasure; his citizenship as a Choctaw never having been lost, it might be resumed without any other prejudice, than the loss of his interest in the Choctaw annuity. The fact then, that the defendant and her supposed husband had received patents for lands under the fourteenth section of the treaty, does not make them citizens; a grant to an Indian, or a foreigner, does not change his political or civil condition; either of them are competent to hold land under a treaty, or a legislative grant. [20 Johns. R. 693.[ It may be asked, as in the case here cited—Do our laws allow "Indians to participate equally with us in our civil and political privileges? Do they vote at our elections, or are they represented in our legislature, or have they any concern as jurors or magistrates, in the administration of justice? Are they subject to our laws of marriage and divorce, and would we sustain a criminal prosecution for bigamy, if they should change their wives or husbands at pleasure, and according to their own customs, and contract new matrimonial

alliances? I apprehend that every one of these questions must be answered in the negative;" at least so long as they continue a distinct and independent community.

In Wall v. Williamson, 8 Ala. Rep. 48, it was held that a marriage between a man and woman of Choctaw extraction and belonging to that tribe of Indians, according to their usages and customs, and before they were superseded by the laws of Alabama, will be recognized as valid. *Further*, that if by the Choctaw law, the husband took no part of the wife's property, the wife must as a necessary consequence retain the capacity to contract, yet she could not be sued in a *court of law*, while the marriage continued. The question is left open, whether the husband could dissolve the marriage by the abandonment of his wife, if they continued to reside in Alabama after their tribe had departed, but it is said to be "very clear that the same effect must be given to a dissolution of the marriage by the Choctaw law, as given to the marriage by the same law. By that law it appears the husband may at pleasure dissolve the relationship. His abandonment is evidence that he has done so. We conceive the same effect must be given to this act as would be given to a lawful decree in a civilized community dissolving the marriage. If the marriage was by the Choctaw law dissoluble at the pleasure of the husband, and was dissolved by his abandonment, then the wife could be sued as a *feme sole*. *Lastly*, abandonment was inferable from the fact of the husband leaving his wife, and going with his tribe west of the Mississippi. [See also, Morgan v. McGhee, 5 Hump. Rep. 13; Hantz v. Sealy, 6 Binn. Rep. 405; Fenton v. Reed, 4 Johns. Rep. 52; State v. Murphy, 6 Ala. Rep. 765, and cases there cited.]

The decision in eighth Alabama Reports, covers almost the entire branch we are now considering of the case before us, and we think, if the jury affirm the truth of the facts stated by the witnesses at the trial, the defendant may be sued as a *feme sole*. It is said, "the characteristic features of the marriage contract is its permanency; for although it originates in the will of the parties, yet after being contracted, the duration of the union is wholly independent of the will of the parties." [Shelf. on Marriage and Divorce, 3.] But

when a man and woman agree to cohabit for an indefinite period as husband and wife, " that, in a state of nature, would be a marriage, and in the absence of civil and religious institutions, might safely be presumed to be, as it is popularly called, *a marriage in the sight of God.*" It has been made a question how long the cohabitation must continue by the law of nature—whether to the end of life. In answer to that inquiry it is said, " that it cannot be a mere casual and temporary commerce, but must be a contract at least extending to such purposes of a more permanent nature in the intention of the parties. The contract thus formed in the state of nature, is adopted as a contract of the greatest importance in civil institutions, and it is charged with a vast variety of obligations merely civil. [Id. 9.] Marriages among the Indian tribes must be regarded as taking place in a state of nature, and if according to the usages and customs of the particular tribe, the parties are authorized to dissolve it at pleasure, the right of dissolution will be considered a term of the contract. Either party may take advantage of this term, unless it be expressly, or impliedly waived by them, or they may perhaps acquire such relations to society as will give permanency to the contract, and take from them the right to annul it.

It will be observed, that the cohabitation of the defendant and D. W. Wall commenced previous to the extension of the jurisdiction of this State over the Indian territory, by the act of 1832; that this enactment abolished only the "laws, usages, and customs of the Creek and Cherokee nations of Indians," —leaving those of the Choctaws in full force, except so far as they might interfere with the exercise of the jurisdiction conferred upon the tribunals of the State. There is then nothing in the statute which takes from the contract its dissoluble quality by act of the parties—nor can the asking a reservation under the treaty, the acceptance of a patent from the United States for the land embraced by it, and the continued cohabitation in this State for more than five years after the ratification of the treaty, and the departure of the mass of their tribe to the west, have that effect. We have seen that all these cannot take from the defendant and D.

W. Wall their citizenship as Choctaws. The treaty secures to them the right of resuming at pleasure their *status* in the tribe, without reference to time. It cannot in this view of the case be assumed, that the marriage was consummated in contemplation of a residence in Alabama, so as to make this State the *matrimonial domicil,* and its laws govern the relation of the parties. Considering the character of the Indians, their indisposition to renounce native habits and associations, the residence of the parties, &c., such an assumption cannot be indulged.

This exposition of the law applicable to the pleading and facts stated in the record, may suffice to guide the action of the circuit court on a future trial. We will not stop to consider with particularity the questions arising upon the pleadings, or the charges asked or given to the jury, farther than has been already done. In limiting the operation of the 9th section of the act of 1832 to Indians of full blood, we have seen that the law was incorrectly ruled ; the judgment is therefore reversed, and the cause remanded.