## CYR v. WALKER *et al.*

No. 766. Opinion Filed July 11, 1911.

(116 Pac. 931.)

1. **EVIDENCE—Presumptions.** Where an act is done which can be done legally only after the performance of some prior act, proof of the latter carries with it a presumption of the due performance of the prior act.

2. **INDIANS—Indian Divorce—Validity as to Adopted Whites.** A foreigner, born in Canada, immigrated to the United States and was adopted by the Pottawatomie Tribe of Indians. After his adoption into the tribe, and after his wife, who was a member of the tribe, had died, he married as his second wife a woman who was not a member of the tribe. While he was living with the

tribe upon its reservation as a member thereof, and while the tribe was under the general supervision of the federal authorities, he was divorced from his second wife, according to the customs and usages of the tribe. **Held**, that said divorce, recognized by the tribe as valid under its customs and usages, will be recognized and treated as valid by the courts of the state.

(Syllabus by the Court.)

*Error from District Court, Pottawatomie County; W. N. Maben, Judge.*

Ejectment by Azelda Cyr against Dora Walker, Lula Walker, Minnie Walker, Charles Walker, Melvin Walker, and E. C. Nichols and E. W. Miller, as executors of the estate of James Walker, deceased. Judgment for defendants, and plaintiff brings error. Affirmed.

*B. B. Blakeney,* for plaintiff in error.

*G. A. Outcelt,* for defendants in error.

HAYES, J. This is an action in ejectment, brought by plaintiff in error, to recover the possession of an undivided half of a certain tract of land situated in Pottawatomie county. She claims to be the owner of the title to and entitled to possession of the land in controversy as the surviving wife of one Xavier Delonias, deceased. Defendants in error claim to be the owners of and entitled to the possession of said land as the heirs and executors of one James Walker, deceased, who is the grantee of one Joel Delonias, a son and only surviving child of the deceased Xavier Delonias.

The facts, in so far as they are pertinent to the questions presented by this appeal for our consideration, are substantially that Xavier Delonias, a white man, without any Indian blood, and born in the Dominion of Canada, after coming to the United States married a member of the Pottawatomie Tribe of Indians. There was born to him by that wife the one son, named Joel Delonias. This wife died about 1867. Prior to her death, Xavier Delonias was adopted into the Pottawatomie Tribe of Indians, and selected allotments of land under the provisions of a treaty between the United States and said tribe of Indians, negotiated

in 1861 and ratified and approved in the month of April, 1862. After the death of his Indian wife, on the 10th day of February, 1868, in the state of Illinois, Xavier Delonias married plaintiff in error in this action, and they lived together as husband and wife for a number of years. About 1885 he came to the Pottawatomie reservation in the Indian Territory, where he afterwards lived as a member of said tribe of Indians, and took an allotment of land for himself and son, with whom he lived until his death. After his death, which occurred about 1892, the son, Joel Delonias, conveyed, as the sole heir of his deceased father, his father's entire allotment to James Walker. Whether plaintiff in error is entitled to share with Joel Delonias, the son of her deceased husband, in said allotment depends upon whether she was Xavier Delonias' wife at the time of his decease, or had been, prior to said time, divorced according to the laws and customs of the Pottawatomie Tribe of Indians.

The trial in the court below was to a jury, who returned a general verdict in favor of defendants-in error and answers to special interrogatories propounded by the court upon request of plaintiff in error. Plaintiff in error states in her brief that there are four errors which she desires to urge in this proceeding, the first two of which are stated by her in the following language:

"Whether or not a supposed custom existing among the members of the Pottawatomie Tribe of Indians, allowing them to marry and divorce at will, without the intervention of any court, by simply taking up with or leaving one of the opposite sex at pleasure, is applicable to a citizen of the United States. Second, whether such custom, if the same prevailed, would apply to adopted members of the Indian tribes."

The contention of plaintiff in error, as expressed in the assignments of error quoted above, may be paraphrased as follows: First, that Xavier Delonias became a citizen of the United States prior to his marriage to plaintiff in error, because of his receiving a patent to certain lands allotted to him as an adopted member of the Pottawatomie Tribe of Indians in Kansas, under the treaty of the United States with said tribe, ratified in 1862; and that therefore, although he afterwards lived with said tribe as a

member thereof on its reservation in Pottawatomie county, and participated in the allotment of said reservation, the laws and customs of said tribe as to marriage and divorce could not apply to him; and, second, that if he did not become a citizen of the United States, such custom and rule of the tribe would not apply to him, because he was only an adopted member of said tribe. If we assume, without deciding, that Xavier Delonias having become a citizen of the United States would prevent the application to him of the laws and customs of the Pottawatomie Tribe of Indians as to divorce, the burden of proving that he did become a citizen of the United States would be upon plaintiff in error, and the evidence, in our opinion, fails to establish that fact; and we need not, therefore, determine what would have been the effect of his becoming a citizen of the United States, had he done so before his marriage to plaintiff in error, as contended by her. It is admitted that Xavier Delonias was not a citizen of the United States by birth, and that if he ever became such it was because of his having been allotted lands and receiving a patent therefor under the treaty with the Pottawatomie Tribe of Indians, negotiated in 1861 and ratified in 1862. 12 U. S. Stat. at L. p. 1191.

Articles 1 and 2 of that treaty provide for the allotment of certain lands in the reservation of the Pottawatomie Tribe of Indians in Kansas. They provide that lands may be allotted in severalty to those members of the tribe who have adopted the customs of the whites and desire to have separate tracts assigned to them. To those who did not desire to receive separate allotments, the President of the United States was authorized to assign portions of said reservation, to be held in common. When separate allotments were completed under these articles, it was provided that certificates should be issued by the Commissioner of Indian Affairs for the tracts assigned in severalty, specifying the names of the individuals to whom they were assigned, respectively; and that said tracts were then set apart for the perpetual and exclusive use and benefit of such assignees and their heirs. .Such allotments were made exempt from levy

and taxation, and the allottee was prohibited from alienating, leasing, or otherwise disposing of the same, except to the United States or to members of the Pottawatomie Tribe of Indians, with permission of the President. Under these two articles of the treaty, no provision was made for issuance of patent to any allottee. The acceptance of allotments in severalty was not compulsory, and could be taken at the option of the Indian. This privilege resulted in the tribe separating in two divisions, known, respectively, as the "Citizens' Band," which consisted of those who took allotments, and the "Prairie Band," which consisted of those who preferred to live upon the reservation and hold their lands in common.

Neither article 1 nor article 2 of the treaty made any provision for the dissolution of the tribal government, or for any member of said tribe ceasing to be a member thereof; but article 3 of the treaty reads as follows:

"At any time hereafter when the President of the United States shall have become satisfied that any adults, being males and heads of families, who may be allottees under the provisions of the foregoing article, are sufficiently intelligent and prudent to control their affairs and interests, he may, at the requests of such persons, cause the lands severally held by them to be conveyed to them by patent in fee simple, with power of alienation; and may, at the same time, cause to be paid to them, in cash or in the bonds of the United States, their proportion of the cash value of the credits of the tribe, principal and interest, then held in trust by the United States, and also, as the same may be received, their proportion of the proceeds of the sale of lands under the provisions of this treaty. And on such patents being issued and such payments ordered to be made by the President, such competent persons shall cease to be members of said tribe, and shall become citizens of the United States; and thereafter the lands so patented to them shall be subject to levy, taxation, and sale in like manner with the property of other citizens: *Provided* that, before making any such application to the President, they shall appear in open court in the District Court of the United States for the District of Kansas, and make the same proof and take the same oath of allegiance as is provided by law for the naturalization of aliens, and shall also make proof to the satisfaction of said court that they are sufficiently intelligent and

prudent to control their affairs and interests, that they have adopted the habits of civilized life, and have been able to support, for at least five years, themselves and families."

The foregoing article of the treaty did not dissolve the tribal government, nor did it make all those Indians who received allotments under the treaty cease to be members of the tribe or become citizens of the United States. The effect of this article was that any Indian who was an adult, being a male and the head of a family, having received his allotment, might, by appearing in open court and making proof of his capacity to control his affairs, taking the oath of allegiance, receive a patent to the lands allotted to him, and, upon the issuance of such patent, he became a citizen of the United States, and ceased to be a member of the tribe. But the tribe was not dissolved; nor did the other members of the tribe to whom allotments had been made, but who did not seek to make proof of their intelligence and ability to control their affairs, and secure a patent to the allotment, cease to be members of the tribe.

By article 1 of the treaty with this tribe, negotiated on the 29th day of March, 1866, and approved the 5th day of May of the same year, the benefits of article 3 of the treaty of 1862, *supra,* were extended to all adult persons of the tribe, without distinction as to sex, and without reference to whether such persons were the heads of families or otherwise. Xavier Delonias, as an adopted member of said tribe, received under the treaty of 1862 an allotment of land; and it is contended by plaintiff in error that he received a patent therefor in the year 1867, before the negotiation and execution of another treaty with the same tribe of Indians, approved on the 7th day of August, 1868. 15 U. S. Stat. at L. p. 531. The last-mentioned treaty provides for the selection of a reservation in the Indian Territory, not to exceed 30 miles square, and the removal of the Citizens' Band of Pottawatomie Indians from Kansas to that reservation. The treaty prohibits the members of the Prairie Band from sharing in the new reservation, and does not require that all members of the Citizens' Band shall remove thereto.

Article 4 provides that a register shall be made under the

direction of the agent and business committee of the tribe within two years after the ratification of the treaty, which must show the names of all members of the tribe who declare they desire to remove to the new reservation, and of all who desire to remain and become citizens of the United States. ·Upon the filing· of such register in the office of the Commissioner of Indian Affairs, all restrictions upon the alienation of lands by adults who declared their intention to remove to the new reservation were removed, and such allottees were authorized to sell their allotments under the provisions of said article, preparatory to removing to the new reservation.

Article 6 of this treaty continues in force article 3, *supra,* of the treaty of 1862, with an additional provision that as to all those Indians who desired to remain and become citizens, before patent should issue and payment be made to them of the portion of the tribal fund to which they were entitled, a certificate should be necessary from the agent and business committee that the applicant was competent to manage his own affairs. Under these provisions of the treaty, a member of the Citizens' Band had a choice of two courses: He could express his desire to remove to the new reservation, whereupon he could sell his˗land; or he could express his desire to remain in Kansas and become a citizen of the United States, and thereafter he would become a citizen of the United States if he could comply with the provisions of article 3 of the treaty of 1862, as modified by article 6 of the last treaty; provided, however, such citizen was able to comply with said article 3 within five years after the ratification of the treaty of 1868. If he was not able to comply with the provisions of said treaty, all lands held by such Indian were required to be sold, and such Indian was required to remove to the new reservation. 15 U. S. Stat. at L. p. 533.

Xavier·Delonias sold his allotment in Kansas long after the ratification of this last treaty, but whether he sold it under the provisions of the treaty of 1862, or under the provisions of the treaty of 1868, the record is silent; nor does the record show whether upon the making of the register provided for by the

treaty of 1868 he expressed a desire to remove to the new reservation or to remain in Kansas; but the record does show that he subsequently removed to the new reservation, lived with the tribe as one of its members, was treated as such, and received his share of the new reservation as a member of the tribe. Since he would not have been entitled to membership in the tribe if he had expressed a desire to remain in Kansas and to become a citizen of the United States and had received his patent under the treaty of 1862, it must be presumed that he acted under and complied with the provisions of the treaty of 1868, which entitled him to remove to the new reservation and share in its benefits.

"It is a rule of general application that, where an act is done which can be done legally only after the performance of some prior one, proof of the latter carries with it a presumption of the due performance of the prior act." (*Knox Co. v. Ninth Nat. Bank,* 147 U. S. 91, 13 Sup. Ct. 267, 37 L. Ed. 93.)

If Delonias did not do everything necessary to comply with the treaty of 1868, and if he acted under the treaty of 1862, and became a citizen of the United States, the burden to establish these facts was upon plaintiff in error. *Nofire v. United States,* 164 U. S. 657, 17 Sup. Ct. 212, 41 L. Ed. 588.

The only evidence in the record, by which it is attempted to show that Xavier Delonias became a citizen of the United States under the treaty of 1862, is the testimony of his son, Joel Delonias, who testifies at one place that his father did receive a patent to his allotment in Kansas prior to his marriage, and prior to the ratification of the treaty of 1868; but at another point in his testimony he states that he supposes such to be the fact, and admits that he does not know; and when asked whether in speaking of his father's patent he meant the final patent or the certificate, his answer was that it was a deed, as near as he could recollect. We are of the opinion that the uncertain and indefinite character of the testimony of this witness, who is a half-blood Indian, and without much knowledge of business as it appears from the record, is not sufficient to overcome the presumption that Delonias was a member of the Citizens' Band of the

Pottawatomie Tribe of Indians at the time of the ratification of the treaty of 1868, and that he complied with its provisions, which presumption arises by reason of the fact that he was permitted to remove to said reservation, live as a member of said tribe of Indians, treated as such, and permitted to share in the tribe's property. At any rate, whether he ever became a citizen of the United States, under the evidence, was properly a question for the jury.

There is evidence tending to establish, and the jury, under the instructions of the court, by their general verdict has found, that at the time it is claimed Delonias was divorced from plaintiff in error there existed among the tribe of Indians of which he was a member a custom regulating marriage which rendered any formal contract or ceremony unessential to the formation of the marriage relation. Mere meeting and cohabitation as husband and wife constituted a marriage, and the dissolution of such marriage was effected by separation of the parties with the intention of no longer living together as husband and wife, which separation, by mutual consent or by abandonment by one or the other, was equivalent to an absolute divorce, and the parties thereafter were free to form other marital alliances. There is evidence tending to prove, and by the general verdict of the jury it has been found, that Delonias was divorced from plaintiff in error under this custom of his tribe, unless, as is contended by plaintiff in error, the custom of the tribe had no application to him because he was an adopted member of the tribe, and not a member thereof because of his having any Indian blood. The courts of the American Union have, from an early time, recognized the validity of marriages contracted between the members of any Indian tribe in accordance with the laws and customs of such tribe, where the tribal relations and government existed at the time of the marriage, and there was no federal statute rendering the tribal customs or laws invalid (*Morgan v. McGhee,* 5 Hump. [Tenn.] 13; *Earl v. Godley,* 42 Minn. 361, 44 N. W. 254, 7 L. R. A. 125, 18 Am. St. Rep. 517); and such marriages between a member of an Indian tribe and a white person, not a

member of such tribe, have been held and regarded as valid, the same as such marriages between members of the tribe. *Morgan v. McGhee, supra; Wall v. Williamson,* 8 Ala. 48; *Wall v. Williams,* 11 Ala. 826; *Johnson v. Johnson,* 30 Mo. 72, 77 Am. Dec. 598; *La Riviere v. La Riviere,* 77 Mo. 512. And the same effect is given to the dissolution of the marriages under the customs of the tribe as is given to the marriage relation itself. *Wall v. Williamson, supra; Wall v. Williams, supra.* So long as Indians live together under the tribal relation and tribal government, they are subject only to the jurisdiction of Congress. The civil laws of the state do not extend to them. As long as they live in their tribal relations, they have been regarded by the government and by the courts as dependent governments, subject to the will of Congress and under the laws of the United States. They have been uniformly recognized as capable of regulating and managing their own tribal affairs, including their domestic relations; and domestic relations formed under their customs and laws have been treated by the courts as valid. *Kobogum v. Jackson Iron Co.,* 76 Mich. 498, 43 N. W. 602; *Boyer v. Dively et al.,* 58 Mo. 510.

The Pottawatomie Indians who removed from Kansas to their reservation in the Indian Territory continued their tribal relations after their removal, and were under the supervision of the agents of the federal government, and governed by their tribal officers, customs, and laws. Their right to continue their tribal government was not denied by the treaty under which they were removed. On the other hand, it was specifically recognized in the provision of article 3 thereof (15 U. S. Stat. at L. p. 532), which reads as follows:

"After such reservation shall have been selected and set apart for the Pottawatomies, it shall never be included within the jurisdiction of any state or territory, unless an Indian territory shall be organized as provided for in certain treaties made in eighteen hundred and sixty-six with the Choctaws and other tribes occupying the 'Indian country'; in which case, or in case of the organization of a legislative council or other body, for the regulation of matters affecting the relations of the tribes to each other,

the Pottawatomies resident thereon shall have the right to representation, according to their numbers, on equal terms with the other tribes."

At the time of the alleged separation of Delonias from plaintiff in error, this tribe of Indians was not subject to the laws of any state, and no federal statute has been called to our attention, and we have been unable to find any, that renders invalid marriages and divorces between the members of said tribe, made in accordance with its laws and customs. Delonias was not a citizen of the United States; he was a foreigner by birth, and the jurisdiction of the federal government over him was that of an adopted member of said tribe of Indians. Speaking of the effect upon the status of a citizen of the United States resulting from his adoption into one of the Indian tribes, the court, in *Raymond v. Raymond*, 83 Fed. 721, 28 C. C. A. 38, said:

"He remains a citizen of the United States. He still owes support and allegiance to the land of his birth, and is still entitled to her protection against the assaults of every foreign prince, potentate, or power. (Citing authorities.) His adoption into one of these tribes has the effect to bestow on him the privileges and immunities of its members, and subjects him to the laws and usages of the tribe, but it has no greater effect."

The adoption of Delonias by the tribe did not make him a citizen of the United States—he still remained a foreigner as to the federal government—but did make him a member of said tribe, and bestowed upon him the privileges and immunities of its other members, and subjected him to its laws and usages, among which were the customs and laws of the tribe regulating marriage and divorce. And there is evidence that marriages and divorces were made by intermarried and adopted citizens of the tribe in accordance with such customs and usages of the tribe, and were recognized by the tribe as valid. In the absence of any congressional act regulating the adoption of persons into this tribe, and of the rights of such persons, we think it must be held that such adopted persons were entitled to the rights and privileges accorded to them by the tribe, and subject to the burdens and obligations that the laws and customs of the tribe imposed.

The next assignment of error complains of the refusal of the court to give an instruction requested by plaintiff in error; but, since this assignment has not been made in compliance with rule 25 of this court (20 Okla. xii, 95 Pac. viii), the same will not be considered.

The questions raised by the fourth and last assignments of error have been disposed of in the consideration of the first and second assignments.

It follows from the foregoing views that the judgment of the trial court should be affirmed.

All the Justices concur.