Smith v. Brown.

VALENTINE, J., concurring.

---

JACOB SMITH, *et al.*, v. JAMES H. BROWN, *et al.*

1. INSTRUCTIONS; *Party not prejudiced cannot complain.* Where it becomes necessary for the plaintiffs in error to establish a marriage, and the court in its charge laid down the law as to what constitutes marriage in the most favorable view for the plaintiffs in error, they are not in a position to complain.

2. ———— *When erroneous Instruction no ground for reversal.* Where the action is for the recovery of land, and the defendants claim on the ground of heirship and also on the ground of estoppel, and it is perfectly clear from the record that the jury must have decided the case on the ground of heirship, an erroneous ruling on the law of estoppel is not cause for reversal.

Statement of the Case.

3. PRACTICE; *Empaneling Jury under Code of* 1862. When this cause was tried, it was not error to empanel the jury by placing twelve men in the box, and as each juror was called requiring each party to accept or challenge him for cause or peremptorily.

4. WITNESS; *Competency of.* An Indian is not incompetent because he does not know the nature of an oath exactly, or the penalties for perjury, but thinks he will be hanged if he tells a lie.

5. PRACTICE; *Motion must be good as made.* If any portion of the evidence objected to is competent, the court may, on a motion to exclude the whole, exclude the part that is incompetent, but is not obliged to do so; it may only respond to the motion as made, and overrule. The motion must fit the case, or the court may overrule it.

6. EVIDENCE; *Hearsay; Marriage, Death, etc.* Where the facts of relationship and descent, or of birth, marriage, or death, are in controversy, evidence is properly admitted of what the witness heard members of the family, since deceased, say as to those facts.

## *Error from Shawnee District Court.*

JACOB SMITH brought ejectment for the undivided three-tenths of a certain section of land in Shawnee county, being a parcel of the tract known as the Kansas Half-Breed Indian Lands. *James H. Brown*, and eighteen others (including the heirs of Adel Bellmard) were made principal defendants, and were alleged to be in possession of the lands, denying plaintiff's title and right of possession, and excluding him therefrom. These parties are designated in the charge of the court below, and in the opinion of this court as the "defendants in possession." *Smith* also made *Julia Pappan* and nine others defendants, alleging that they had an interest in the premises under a claim of title similar to his own, and adverse to that of the defendants in possession, but that they refused to join with him in proceedings to determine such title and interest; and these parties are designated as "defendants out of possession." *Smith* and each of the defendants out of possession claimed respectively a certain undivided interest in the whole of said "section two." The defendants in possession claimed respectively a certain number of acres in severalty. All parties claimed as owners in fee simple, and all claimed as heirs, or as assignees of deceased heirs, of Clement the reservee named in

the treaty of June 3 1825 between the United States and the Kansas Nation of Indians: (7 U. S. Stat. at Large, 245.) So much of said treaty as is material is as follows:

"ART. 6.–From the lands above ceded to the United States there shall be made the following reservations, of one mile square, for each of the half-breeds of the Kansas Nation, viz: For Adel and Clement, the two children of Clement; * * * to be located on the north side of the Kansas river, in the order above named, commencing at the line of the Kansas reservation, (designated in article two,) and extending down the Kansas river for quantity."

The "section two" named in the petition is the tract reserved to Clement the son. By act of congress of May 26, 1860, (12 Stat. at Large, 21,) as modified by joint resolution approved July 17, 1862, (id., 628,) title in fee simple absolute was vested in the reservees named in said article six, then living, to the land reserved to them respectively, and in case of their death to the heirs of such deceased reservees. Clement the elder, the father of the reservee, was a Frenchman or Canadian, whose name was Clement Lassert; he resided in the Kansas Nation of Indians many years, and was an interpreter for that tribe. The mother of Adel and Clement was an Indian woman named Me-ha-ton-ga. The precise relations existing between Lassert and Me-ha-ton-ga was one of the contested questions in this case. The plaintiff and defendants out of possession contended that Lassert and Me-ha-ton-ga were married, and subsequently divorced, in accordance with the Indian custom, and that such marriage occurred about 1820, and such divorce in 1827 or 1828. Said Indian "customs," as testified to by five or six witnesses, some of them Indians, are as follows:

"The custom governing the marriage contract among the Kansas Nation of Indians is this: The man picks out the Indian woman he wants to marry, and generally gets three or four of the bravest men of the nation to go and ask the mother and father of the girl for her, for the man; and if the parents consent to the marriage they dress the girl and take her to the lodge of the bridegroom and present her to him And sometimes he gives in return for her, horses, blankets,

and other presents, and the parties promise each other to be man and wife, and sometimes a feast and dance is had, and that closes the marriage ceremony. There is no priest or other person who performs any ceremony at the marriage. When the parties agree with each other to live together as man and wife, and do so live together, then they are man and wife according to the Indian custom so long as they so live together. When a man and wife get tired living together, and wish to separate and leave each other, then all they have to do to cease to be man and wife under the Indian custom is to separate and throw off or abandon each other, and quit living together and go apart. Then they are no longer husband and wife according to the Indian custom. And then after such separation there is no Indian custom that prevents either or both of the parties from marrying again who they please."

Lassert and Me-ha-ton-ga "went apart" in 1827 or 1828; and in 1829 Lassert went to Kansas City where he married Julia Roy, now *Julia Pappan*, one of the defendants. Lassert and *Julia* lived together as husband and wife until 1854 when Lassert died. During the time they so lived together nine children were born unto them. These children and their mother *Julia*, and parties claiming under them, are the "defendants out of possession." The plaintiff *Smith* claimed as grantee of said *Julia Pappan*, and of Frank Lassert, one of said children. Clement the reservee died in 1835, leaving no widow or children. It was claimed by *Smith* and the defendants out of possession that Lassert's marriage to Me-ha-ton-ga was legal; that their separation operated as a legal divorcement; that, being so divorced, Lassert's marriage to Julia Roy (now Pappan) was legal; that at the death of Clement the reservee his father Clement Lassert was his sole heir; that on the death of Lassert, his widow *Julia* was entitled to one-half of all his estate, and his ten children—Adel, daughter of Me-ha-ton-ga, and the nine children of *Julia*—were entitled to the remaining half; and that by operation of said act of May 26, 1860, the title to said "section two" became vested in said widow and children, as the heirs of Clement the reservee.

Adel, the daughter of Me-ha-ton-ga, married *Moise Bell-mard;* and after Lassert's death she took possession of said

"section two," and (she having died before this suit was brought) her husband and children, and her grantees, are the "defendants in possession." On their part it was claimed, first, that Lassert and Me-ha-ton-ga were legally married; that Adel and Clement were legitimate children; that their parents were not divorced; that the marriage of Lassert and Julia Roy was illegal, and their children illegitimate; that said *Julia* was not capable of taking as widow, nor her children as inheriting as heirs of Lassert; or, second, if Lassert and Me-ha-ton-ga were not legally married, then, as Clement the reservee was illegitimate, Lassert the father could not be his heir, but his estate at his death would go to his mother, Me-ha-ton-ga; and that in such case, if Lassert's marriage to Julia was legal, and her children legitimate, neither she nor they could be or become the heirs of Clement the reservee; and that therefore, whichever be the fact, Lassert and Me-ha-ton-ga both being dead, Adel, as his sister by the same mother, was the sole heir of Clement the reservee, and under the operation of said act of May 26, 1860, the title to said "section two" vested in her and her heirs and assigns. On the part of the defendants in possession it was further claimed that *Julia Pappan* and several of her children had been present at a time when Adel was selling and conveying a part of the land in controversy, and had then asserted Adel's title thereto, and that they, and plaintiff *Smith* as grantee, were thereby estopped from denying such title; but it was not claimed that this estoppel (if any) applied to *Ellen Revard* and others who were not present at the time. The bill of exceptions contains 372 pages. The case was tried at the November Term, 1867, of the district court. The jury found in favor of the defendants in possession, and against the other defendants and the plaintiff, and judgment was rendered accordingly. *Smith* and the defendants out of possession unite as plaintiffs in error and bring the case here for review. The instructions, so far as material, and several questions of practice arising on the trial, are stated in the opinion.

*D. Brockway*, and *John Guthrie*, for plaintiffs in error.

*A. H. & M. H. Case*, for defendants in error.

The opinion of the court was delivered by

KINGMAN, C. J.: The question at issue in the case depends on who are the heirs of Clement, the son of Clement, one of the reservees under the treaty of June 3d 1825 between the United States and the Kansas Nation of Indians. By the 6th article of that treaty one mile square each was reserved "to Adel and Clement, the two children of Clement." Adel was to have the first square mile on the half-breed tract on the west, and Clement the second. On the 26th of May, 1860, congress passed an act vesting the title to these lands in the reservees, and in case of the death of any reservee, then in the heirs of such deceased reservee, the heirs to be determined by the Secretary of the Interior. On the 17th of July 1862 congress passed a joint resolution repealing so much of the act last mentioned as authorized the Secretary of the Interior to decide who are the heirs of the deceased reservees. By the treaty, the act, and the joint resolution, the fee became perfect in the several reservees and their heirs. About the year 1835 Clement the reservee died without wife or issue. His mother, Me-ha-ton-ga, died in the winter of 1861; and Clement the elder died in July 1854. His sister Adel, afterwards Mrs. Bellmard, took possession of the land, and sold it to various parties, who are the defendants in error, and are in possession of the land. Who are really the heirs of Clement the reservee, becomes a question of much difficulty, owing to the complicated domestic relations of Clement Lassert, his reputed father. The plaintiffs in error claim that at one period of his life Clement Lassert the elder became the husband of an Indian woman named Me-ha-ton-ga, and that while they were living together as husband and wife Adel and Clement were born unto them; that afterwards they were divorced, and Lassert married Julia Roy, by whom he had nine children. Julia, now Mrs. Pappan, and her children, and their vendees, are the plaintiffs in error in this case, claiming to be the heirs of Clement the reservee. Whether they are such heirs depends upon the disputed questions as to the marriage of Lassert and Me-ha-ton-ga, and if

they were married, then whether they were divorced prior to
the marriage of Lassert and Julia Roy. If Lassert and the
Indian woman were not married when she bore the children
Adel and Clement, then Lassert could not be the heir of the
the reservee Clement, even though he may have begotten him,
until there was a failure of heirs on the maternal side. If the
parties were married and not divorced, then the marriage of
Lassert and Julia Roy had no validity, and neither she nor her
children became the heirs of Lassert; therefore the marriage
and divorce became the particular points of controversy in the
action. It devolved upon the plaintiffs in error to show both
facts or they would not recover. The burden of proof was on
them. The testimony was voluminous, uncertain, and conflict-
ing. It is not pretended that there was any marriage ceremony,
but that the parties went together and lived together as man
and wife in the Indian country, and without the limits of any
organized state or territory. As to the manner of their life,
there is much discrepancy which it is not necessary to detail.
It is certain that Clement the elder claimed the reservees as his
children, and cared for and educated them as his children, even
after his marriage with Julia Roy. It is certain that he "threw
off" the Indian woman. There was much evidence as to what
constituted marriage and divorce among the Indian tribes, and
especially among the Kansas Nation. This evidence is more
curious than instructive, and like the evidence on the other
points is not easily reconcilable. These questions were left to
the jury, under the instructions of the court. After stating the
situation of the parties and their respective claims, the court
gave this instruction:

"If the jury find from the evidence that Clement Lassert
and Me-ha-ton-ga were married according to customs and usages
of the Kansas Nation of Indians in the Indian country, then
the laws of this state recognize such marriage as legal, and the
progeny of such marriage relation is legitimate and capable of
inheriting from the father; and if they further find from the
evidence that after Adel and Clement were born Clement Lassert
and Me-ha-ton-ga were divorced according to the customs and
usages of the Kansas Nation of Indians in the Indian country,

then the law recognizes such divorce as legal, so that the alleged second wife of Clement, Julia, would take on the death of her husband Clement Lassert, one-half of whatever estate descended to him from Clement the reservee in preference to Me-ha-ton-ga, and the other half would go in equal proportions to the children of Clement Lassert by Me-ha-ton-ga and his children by Julia; in other words, the legitimate children of a father inherit equally from him though their mothers be different women. The law deals not with forms and ceremonies, but looks rather to substance, having its foundation in the intention of the parties to the marriage relation; and evidence of continuous cohabitation as man and wife by a man and woman furnishes *prima facie* evidence of their marriage, which may be repelled however by any evidence which tends to show that they cohabited only from motives of lust, and that a marriage in fact was not intended by either or both of the parties cohabiting.

"On the other hand, if Clement Lassert and Me-ha-ton-ga had not, or if neither of them had, any intention of marrying, and did not in fact do so according to the customs and usages of the Kansas Nation of Indians, or by the law of any state or territory, or the custom or usage of any other tribe or nation of Indians, then Clement Lassert, nor his wife Julia, nor their children, can inherit from Clement the reservee. Again, even though Clement Lassert and Me-ha-ton-ga were married in fact, if they were not divorced according to the customs and usages of the Kansas Nation of Indians, nor by any competent authority of any state or territory, and he assumed to marry Julia Roy, and did cohabit with her for a period of years, and they had children born unto them during such cohabitation while yet Me-ha-ton-ga lived, then and in such case the marriage with Julia was void, and neither she, nor his children by her, can inherit from him.

"If there was no marriage between Clement Lassert and Me-ha-ton-ga, then the verdict must be for the defendants in possession of the premises. If there was a marriage between them, and yet no divorce, then the verdict must be for the defendants in possession. But if there was a marriage between them, and a subsequent divorce, and you find Clement the reservee was their legitimate son, and is now dead leaving no wife or issue, that Clement Lassert subsequent to the divorce married Julia Roy, and had children as above, then you will examine the topic of estoppel."

Under these instructions the jury found for the defendants

in possession. It is impossible to read the evidence and not perceive that there is evidence to·support the verdict, and at least equal in weight to that produced by the plaintiffs in error. Nor do we think that there was essential error in the instructions. If the courts are to decide that a marriage is a prerequisite to the legitimacy of children, then the court laid down the rules for the ascertainment of that fact as favorably as could be asked: See *Johnson v. Johnson, adm'r*, 30 Mo., 71. The instructions did not make any ceremony a necessity to the validity of the marriage, but put the question as to whether the relations of Lassert the elder and Me-ha-ton-ga were those of marriage or lust fairly to the jury, under instructions that gave them no chance to hesitate upon forms and ceremonies, but demanded their attention to the substantial facts.

II. Upon the trial of the cause the defendants, besides the question of heirship, relied upon the fact that the plaintiffs by their acts were estopped from claiming the land even if they showed themselves the true heirs; and upon this point the evidence was voluminous, and the instructions very full and minute. We might well avoid an examination of these instructions, as it is apparent that the jury decided the case without ever reaching the question of estoppel, as they were specially instructed, and the matter was emphasized by repetition that the estoppel did not in any event apply to Ellen Revard and others, and if they found the heirship for the plaintiffs in error, they must find for the excepted persons regardless of the question of estoppel. The jury were also charged that they must first decide the question of heirship, and if the decision was in favor of the defendants in error, they need not examine the question of estoppel. They found for such defendants and against Ellen Revard and others, against whom there was no pretense of estoppel. It is certainly apparent· from this that the jury decided the case on the issue of heirship only, and any error in the charge as to estoppel could not have injuriously affected the plaintiffs in error. We may add that we have· found nothing in the charge as to the law of estoppel that is objectionable. The court, however, after stating that the burden of proof as to

heirship was on the plaintiffs in error, and that they must show their right by a preponderance of evidence, stated as to the ground of estoppel the burden of proof was on those who asserted it, and then gave this guide to the jury:

"If the plaintiff, independent of the subject of estoppel, made out his case by a preponderance of the evidence, it then devolves upon the defendants alleging the estoppel to make out that fact by evidence on that subject *equal in weight* to that of the plaintiff before a verdict can be rendered for them. If on this subject the plaintiff's evidence preponderates also, when coupled with the antecedent finding just alluded to, then the plaintiff has the case. In other words, the plaintiff recovers by the preponderance of the evidence on all the issues. The defendants in possession of the premises defeat a recovery when they interpose evidence equal in weight to that of the plaintiff."

This is evidently not the law. The correct rule is that the obligations of proving any fact lies upon the party who relies upon that fact, and affirmatively asserts it in the pleadings. In this case the matter of estoppel was relied on by the defendants, and they were bound to establish that proposition by a preponderance of evidence, and the jury should have been so told. But for the reasons above stated, this error is not deemed material in this case, as it is clear that the jury must have determined the case upon the issue of heirship.

III. During the trial various exceptions were taken which we will now notice: The first of these was in the empaneling of the jury. The facts are these: Twelve men were placed in the box and sworn to answer questions as to their competency. When the first one was called the court required the parties to accept or challenge him for cause, or peremptorily, before any other person was called up. The statutes at that time had made no direct provisions as to the manner of the empaneling the jury. The method adopted did not prevent a fair and impartial jury from being obtained, and we cannot see that either party was prejudiced by it. See *The State v. Potter*, 18 Conn., 166. The present code provides a different method.

IV. Another exception was the permitting a certain Indian

39—8TH KAS.

to testify. On his *voir dire* he showed that he had not an accurate idea of an oath, but plainly testified that he knew it would be wrong to tell a lie, and that he supposed he would be hanged if he did so. That he did not know the penalties of perjury, or what perjury was, but that it was bad to speak falsely, and that he believed when he died he would go above. We think the court correctly permitted the witness to testify. The exact extent of intellectual attainments necessary to qualify a person to become a witness cannot be stated precisely. The objection urged to this witness was not a want of sufficient age, or that he was an idiot, or insane, or of weak mind; but that he did not understand the nature and obligation of an oath. He was an uneducated Indian, not deficient in understanding, but uninstructed as to the nature of an oath, and mistaken as to the punishment for perjury, an act which by that name he did not know; yet he knew that it was wrong to speak falsely, and that he would be punished for so doing. Whether he believed that he would be punished in another life was a matter that could not be inquired into under our constitution. His evidence afterwards given is such as confirms the opinion we have expressed as to his competency.

V. The defendants in error offered in evidence the deposition of Mrs. Julia Pappan. The plaintiffs in error moved to strike out that part of the deposition which is as follows:

"Clement Lassert my former husband told me always that he never was married to the Indian woman, the mother of Adel and Clement the reservee. *Question:* State whether he told you so both before and after you married him? *Answer:* He did both before and after."

The motion was made on the grounds that the evidence was hearsay, and that it was incompetent for the witness to testify to the communications made to her by her husband during the marriage. The evidence was not objectionable on the grounds that it was hearsay, for while it was literally hearsay it was of a kind authorized by law to be given where the facts of descent and relationship, or of birth, marriage, and death, are in controversy, as in this case: 1 Greenl. Ev., §§ 103, 104. The

objection on the ground that the evidence was of statements made to her by her husband is a question requiring more attention, but there will be found no great difficulty in disposing of it. The rule is well established that the wife cannot be permitted voluntarily, or compelled by authority, to give in evidence communications made to her by her husband, while the marriage relations existed. The reason of the rule is thus stated by Mr. Justice McLean in *Stein v. Bowman*, 13 Peters, 209: " This rule is founded upon the deepest and soundest principles of our nature, principles which have grown out of those domestic relations that constitute the basis of civil society, and which are essential to the enjoyment of that confidence which should subsist between those who are connected by the nearest and dearest relations of life. To break down or impair the great principles which protect the sanctities of husband and wife would be to destroy the best solace of human existence." It is evident that under this rule a portion of the evidence included in the motion was incompetent, and it is as certain that a portion of it was competent. What Lassert told the witness *before* their marriage was proper evidence, and should have been admitted. How far the court was authorized to overrule the objection because it included too much, has often been decided. In general the court is not bound to do more than respond to the motion, and in the terms in which it is made. It is not obliged to modify the propositions submitted by counsel so as to make them fit the case. If they do not fit the case, that is cause enough to authorize their rejection. If any part of the evidence objected to is competent, the court may, on a motion to exclude the whole, exclude the part that is incompetent, but is not obliged to do so: *Elliott v. Piersoll*, 1 Peters, 328, 338. In this case the court could not exclude that portion of the testimony that was competent, and included in the motion of counsel, and therefore had a right to overrule the motion. Another reason may be given why the admission of the incompetent testimony could not affect this case on error: The competent testimony and the incompetent were precisely the same. What Lassert said after his marriage with

the witness, was just what he said before. The evidence given of what was said before marriage was competent; and even if the motion had been to that part that was incompetent, and the court had overruled the motion, the ruling would undoubtedly have been error, but as the same evidence would have remained after correcting the error we could not say that the plaintiffs in error were prejudiced by it. Before passing from this point it may be observed that in *Fuller v. Randall*, 2 Moore & Payne, 20, the court held that declarations by a woman of what her first husband had to say as to who would inherit his estate, were held admissible to show the affinity of the person so mentioned to the husband. This case would support the ruling of the court on the ground that the whole evidence was admissible; but it does not appear from the report that the question was considered as to the competency of the witness to prove the fact, but was decided only on the ground that such evidence from any proper source was competent. There were objections to other portions of the deposition of Mrs. Pappan which are disposed of by the observations already made.

VI. Various witnesses were allowed to testify that they had heard Adel Bellmard declare that she and Clement were illegitimate, or that Clement Lassert and Me-ha-ton-ga, the mother, were never married. All these declarations were made before suit brought, and while she was in possession of the land, and was selling the same. They were receivable in evidence, not as the declarations of a grantor in favor of a grantee, but to show after her death what her own views were of her family relations: 1 Greenl. Ev., § 134. Many more questions as to the admission of testimony were made. Some of them are covered by the principles already stated; some are immaterial, and the others are in reference to the question of estoppel, and need not be examined here. The judgment is affirmed.

All the Justices concurring.