## BUCK v. BRANSON *et al.*

No. 2182. Opinion Filed October 15, 1912.

(127 Pac. 436.)

1. MARRIAGE—Divorce—Effect of Indian Customs. A marriage contracted between members of an Indian tribe, in accordance with the customs of such tribe, where the tribal relations and government existed at the time of such marriage, and there was no federal statute rendering the tribal customs invalid, will be recognized by the courts as a regular and valid marriage for all purposes.

(a) And the same effect is also given to the dissolution of marriages, under the customs of the tribe, as is given to the marriage relation itself.

(b) Such marriages are not to be treated as common-law marriages, but as legal marriages according to the customs of the tribe, when such customs are recognized by Congress as concerning and regulating the domestic relations of the tribe.

2.    **INDIANS**—**Lands**—**Inheritance.** Under the act of Congress approved March 2, 1889 (Act March 2, 1889, c. 422, 25 St. at L. 1013), the laws of the state of Kansas, relative to descent and distribution of real property, were made applicable to and governed the devolution of the estates of members of the Peoria Tribe of Indians in the Indian Territory.

(Syllabus by Robertson, C.)

*Error from District Court, Ottawa County;*
*T. L. Brown, Judge.*

Action by Mary Buck against C. M. Branson, George E. Bowling, and Miami Investment Company, for possession of real estate. Judgment for defendants, and plaintiff brings error. Affirmed.

This case was begun in 1902 in the United States Court in the Indian Territory. On November 11, 1907, a second amended complaint was filed. With the advent of statehood, the cause was transferred to the district court of Ottawa county, where it was tried in 1909. The plaintiff in error claims title to the land in controversy as the wife of Pe-te-lon-o-zah, or William Wea, a Peoria Indian, a member of the United Peoria, Kaskaskia, and Piankashaw Tribe of Indians, through a deceased child that was born to the plaintiff while she and the said William Wea were living together as wife and husband. The patent from the United States to William Wea was issued April 8, 1890. Special findings of fact were made by the court as follows: That William Wea and Mary Buck were married, according to Indian custom, some time prior to 1884, and that some time during said year a child was born which lived but two days; that shortly thereafter William and Mary separated, or, in other words, quit living together, and Mary in a few months went with Frank Buck to the Indian Agent at the Quapaw Agency, and they were there married; that she lived with Frank Buck continuously up to the time of his death, and that there were children born to them as a result of said marriage; that the living together, or marriage, of William Wea and Mary Buck occurred prior to May 2, 1890; that the only evidence in the case as to the marriage of William and Mary was one of custom of said tribe, wherein the parties went to living together, and the only man-

ner of divorce was one of custom, where they simply quit living together; that William Wea died in 1894, seised and possessed of the land described in plaintiff's complaint, leaving no father or mother, grandfather or grandmother, brothers or sisters, and no children surviving him.

*W. H. Kornegay,* for plaintiff in error.

*Halbert H. McCluer* and *Roland Hughes,* for defendants in error.

Opinion by ROBERTSON, C. (after stating the facts as above). Plaintiff in error, for a recovery in this case, depends upon three primary propositions of law, viz.:

First. Did Congress, by its legislation in case of a separation, not followed by divorce, give to that separation in determining heirship and successors to allotted lands in the Peoria Reservation the force and effect of a divorce as commonly understood by the term?

Second. If such was the case, and the parties by separation by mutual agreement could dissolve the marriage status, did Congress even intend by adopting the Kansas law to provide that heirship should be traced through the nearest dead relative?

Third. Could the person not connecting himself by descent with the allottee of the land, in view of the fact that by law it was inalienable for 25 years from date of patent, defend an action by any one, however remotely connected with the allottee as heir, under the rule that the plaintiff was recovering upon the strength of his own title, and not on the weakness of his adversary's title?

It is admitted by counsel for plaintiff in error that the marriage between William Wea and Mary Buck was valid, and that the subsequent relation of Mary to Frank Buck was a legal marriage, unless her prior relations to William Wea prevented. In other words, the contention is made that the separation of Mary from William Wea was not such a "going apart" as amounted to a divorce, and that the subsequent "going together" or marriage of Mary and Frank Buck was therefore bigamous and illegal, and the issue of said last-named union were illegitimate,

and could not inherit the land in controversy, but that Mary as the undivorced wife of William, and the mother of the deceased child, was, in fact, the only heir of the said William Wea. This necessitates an investigation of the validity of divorces under Indian custom. It being conceded that such marriages are valid, we will therefore give that phase of the case no further consideration. In *Wall v. Williamson*, 8 Ala. 48, it is said by the court in discussing this proposition:

"By that law, it appears that the husband may at pleasure dissolve the relation. His abandonment is evidence that he has done so. We conceive the same effect must be given to this act as would be given to a lawful decree in a civilized community dissolving the marriage. However strange it may appear at this day that a marriage may thus easily be dissolved, the Choctaws are scarcely worse than the Romans, who permitted a husband to dismiss his wife for the most frivolous causes. Story, Confl. of Laws, 169."

While in *Wall v. Williams,* 11 Ala. 826, the court says:

"Marriages among the Indian tribes must be regarded as taking place in a state of nature, and, if according to the usages and customs of the particular tribe the parties are authorized to dissolve it at pleasure, the right of dissolution will be considered a term of the contract. Either party may take advantage of this term."

In *Johnson v. Johnson's Adm'r*, 30 Mo. 72, 77 Am. Dec. 598, the court says:

"It is plain that among the savage tribes of this continent marriage is merely a natural contract, and that neither law, custom, nor religion has affixed to it any condition or limitations or forms other than what nature has itself prescribed. It can hardly be said that the power of divorce in one or both of the parties is inconsistent with the law of nature. The fact as we have seen it is otherwise."

In *Smith v. Brown*, 8 Kan. 608, it is said:

"The custom governing the marriage contract among the Kansas Nation of Indians is this: The man picks out the Indian woman he wants to marry, and generally gets three or four of the bravest men of the nation to go and ask the mother and father of the girl for her for the man, and, if the parents consent to the marriage, they dress the girl and take her to the lodge of the bridegroom, and present her to him; and sometimes he

gives in return for her horses, blankets, and other presents, and the parties promise each other to be man and wife, and sometimes a feast and dance is had, and that closes the marriage ceremony. There is no priest or other person who performs any ceremony at the marriage. When the parties agree with each other to live together as man and wife, and do so live together, then they are man and wife, according to the Indian custom, so long as they so live together. When a man and wife get tired living together, and wish to separate and leave each other, then all they have to do is to separate and throw off or abandon each other, and quit living together and go apart. Then they are no longer husband and wife according to the Indian custom; and then, after such separation, there is no Indian custom that prevents either or both of the parties from marrying again whom they please."

Our own Supreme Court, in *Cyr v. Walker,* 29 Okla. 289, 116 Pac. 934, 35 L. R. A. (N. S.) 795, speaking through Hayes, J., has said:

"There is evidence tending to establish, and the jury, under the instructions of the court, by their general verdict has found, that at the time it is claimed Delonias was divorced from plaintiff in error there existed among the tribe of Indians of which he was a member a custom regulating marriage which rendered any formal contract or ceremony unessential to the formation of the marriage relation. Mere meeting and cohabitation as husband and wife, constituted a marriage, and the dissolution of such marriage was effected by separation of the parties with the intention of no longer living together as husband and wife, which separation, by mutual consent or by abandonment by one or the other, was equivalent to an absolute divorce and the parties thereafter were free to form other marital alliances. * * * The courts of the American Union have, from an early time, recognized the validity of marriages contracted between members of any Indian tribe in accordance with the laws and customs of such tribe, where the tribal relations and government existed at the time of the marriage, and there was no federal statute rendering the tribal customs or laws invalid (*Morgan v. McGhee,* 5 Humph. [Tenn.] 13; *Earl v. Godley,* 42 Minn. 361, 44 N. W. 254, 7 L. R. A. 125, 18 Am. St. Rep. 517); and such marriages between a member of an Indian tribe and a white person not a member of such tribe have been held and regarded as valid, the same as such marriages between members of the tribe (*Morgan v. McGhee, supra; Wall v. Williamson,* 8 Ala. 48; *Wall v. Williams,* 11 Ala. 826; *Johnson v. Johnson's Adm'r,* 30 Mo. 72, 77

Am. Dec. 598; *La Riviere v. La Riviere,* 77 Mo. 512). And the same effect is given to the dissolution of the marriages under the customs of the tribe as is given to the marriage relation itself. *Wall v. Williamson, supra; Wall v. Williams, supra.* So long as Indians live together under the tribal relation and tribal government, they are subject only to the jurisdiction of Congress. The civil laws of the state do not extend to them. As long as they live in their tribal relations, they have been regarded by the government and by the courts as dependent governments, subject to the will of Congress and under the laws of the United States. They have been uniformly recognized as capable of regulating and managing their own tribal affairs, including their domestic relations; and domestic relations formed under their customs and laws have been treated by the courts as valid. *Kobogum v. Jackson Iron Co.,* 76 Mich. 498, 43 N. W. 602; *Boyer v. Dively et al.,* 58 Mo. 510."

It might be well to say in passing that such a marriage as the one under discussion was not a common-law marriage, but a legal marriage according to the customs of the Indians, which customs are the laws recognized by Congress concerning and regulating their domestic relations.

Under the facts as disclosed by the record and the law as above enunciated, there can be no question but that William Wea and his wife Mary were regularly divorced long prior to her marriage with Frank Buck, and that her marriage with Buck was valid and their offspring legitimate. This phase of the case being thus disposed of, let us see what law of descent and distribution governed the estate in this case.

The allotment of the land in controversy to William Wea was made by virtue of an act of Congress, approved March 2, 1889 (Act March 2, 1889, c. 422, 25 St. at L. 1013), which act referred to Act Feb. 8, 1887 (Act Feb. 8, 1887, c. 119, 24 St. at L. 388) and made the same applicable to the tribe of Indians to which William Wea belonged; section 5 thereof being as follows:

"Provided, that the law of descent and partition in force in the state or territory where such lands are situate shall apply thereto after patent therefor shall have been executed and delivered, except as herein otherwise provided, and the laws of the state of Kansas regulating the descent and partition of real estate shall, so far as practicable, apply to all lands in the Indian

Territory which may be allotted in severalty under the provisions of this act."

. The law of Kansas referred to in the above is as follows:

"Section 1.    After allowing to the widow and children of any deceased intestate of this state, the homestead provided in the next section of this act, and the personal property and other allowances provided by the law respecting executors and administrators and the settlement of the estates of deceased persons, the remainder of the real estate and personal effects of the intestate, not necessary for the payment of debts, shall be distributed as hereinafter provided."

"Section 18.    Subject to the rights and charges hereinbefore contemplated, the remaining estate of which the decedent dies seised shall, in the absence of other arrangements by will, descend in equal shares to his children.

"Sec. 19.    If any one of his children be dead, the heirs of such child shall inherit his share, in accordance with the rules herein prescribed, in the same manner as though such child had outlived his parents.

"Sec. 20.    If the intestate leave no issue, the whole of the estate shall go to his wife; and if he leave no wife nor issue, the whole of his estate shall go to his parents.

"Sec. 21.    If one of his parents be dead, the whole of the estate shall go to the surviving parent; and if both parents be dead, it shall be disposed of in the same manner as if they, or either of them, had outlived the intestate and died in the possession and ownership of the portion thus falling to their share or to either of them, and so on through ascending ancestors and their issue."    (Comp. Laws 1885, secs. 2239, 2256-2259.)

Sections 20 and 21 of the above statute dispose of this case. Plaintiff, as has been seen, was not the widow of Wea, and therefore cannot inherit through the dead child, and as a matter of law has absolutely no title whatever to the land in controversy. The title to this land was cast by the law of descent and distribution of the laws of the state of Kansas in force at the time of the death of William Wea.

It is unnecessary to pursue the subject further.    Other questions are raised, but under the above conclusions it becomes unnecessary to give them further consideration.    Plaintiff, to recover at all, must do so on the strength of her own title.    It

has been seen that she has none, and it is therefore a matter of no concern to her how weak the title of defendants may be.

There being no error in the record, the judgment of the district court of·Ottawa county should be affirmed.

By the Court: It is so ordered.