## COKER v. MOORE et al.

No. 14440—Opinion Filed June 15, 1926.

(Syllabus.)

1. **Marriage—Divorce—Validity of Custom Marriages and Divorces of Creek Indians.**

The Creek National Council, in 1881, passed a law regulating marriages and divorces. Prior to that time custom marriages and divorces were valid, they having no written law regulating the same. After the passage of the law of 1881, the same was given but little, if any, recognition, and custom marriages and divorces continued generally among the tribe and were uniformly considered by the tribal members to be valid and legal. Notwithstanding the statute law, these custom marriages and divorces will be held valid and legal in our courts.

2. **Same—Effect of Recognition by Tribal Government Despite Creek Statute.**

At all times concerned in this case, the Creek government existed as a separate and independent government, with sole power to indorse, their marriage and divorce statute of 1881, or to ignore it at their option. and if they saw fit to ignore the law and to give full recognition and approval to custom marriages and divorces, then we believe it to be the duty of this court, when we come to determine what constituted a valid marriage or divorce in the Creek Nation at the time their laws only on that subject were in force, to be controlled by what they, as a distinct governing nation, recognized as constituting a valid marriage or divorce.

3. **Same—Validity as Question of Fact—Review.**

Under the tribal customs relative to marriage and divorce, whether or not there was a valid marriage or divorce in any particular case becomes a question of fact to be determined by the jury or the court, upon the facts presented, and unless this court can say, after reviewing and weighing the testimony, that the finding of the trial court is against the clear weight of the evidence same will not be disturbed on appeal.

4. **Guardian and Ward—Appointment of Guardian for Minor 14 Years Old—Authority of County Court.**

The right given by section 1434. C. O. S. 1921, to a minor 14 years of age or over

to nominate his own guardian is an absolute one, and the only discretion of the county judge is as to whether the nominee is a proper and suitable person and a resident of the state.

### 5. Same—Appointment Without Notice to Minor—Invalidity of Proceedings.

Where the record shows this absolute right was denied the minor and that he had no notice of any kind of the proceedings for appointment of guardian, the appointment is void and likewise all proceedings based thereon are necessarily void.

Error from District Court, Creek County; John L. Norman, Judge.

Action by R. J. Dixon against Lake Moore et al.; Colbert Coker intervening. Judgment for defendants, and for plaintiff for less than sued for, and plaintiff and intervener bring error. Appeal dismissed by plaintiff in error Dixon. Reversed in part and affirmed in part.

A. A. Hatch and T. H. Wren, for plaintiff in error.

Joseph C. Stone, Charles A. Moon, and Francis Stewart, for defendant in error.

HUNT, J. This is an appeal from the district court of Creek county, prosecuted by R. J. Dixon and Colbert Coker, as plaintiffs in error, from a judgment rendered against them in an action wherein said R. J. Dixon was plaintiff, Colbert Coker was intervener, and Lake Moore et al. were defendants. Since the action was filed in this court, to wit, on March 18, 1925, plaintiff in error R. J. Dixon dismissed his appeal with prejudice, leaving said Colbert Coker, intervener in the court below, as the sole plaintiff in error.

The title to three Creek allotments is involved; the same being the allotments of Polly Coker, Lucy Coker, and Jipsey Coker, all deceased. Colbert Coker is a son of Polly Coker, and a brother of Lucy and Jipsey Coker, and by reason thereof claims an undivided one-half interest in each of said allotments. The defendant in error Lake Moore claims to be the owner in fee of each of said allotments by reason of conveyances by certain heirs of the allottees, and by reason of a guardian's deed from one Fred L. Strough, as guardian of Colbert Coker, purporting to convey whatever interest said Colbert Coker had inherited in the allotment of his mother, Polly Coker.

The assignments of error relied on by plaintiff in error are: First, that the court erred in finding and holding and adjudging that Charley Coker was the lawful husband of Polly Coker at the time of her death and that he, therefore, inherited an interest in the allotment of Polly Coker, Jipsey Coker, and Lucy Coker. Second, that the court erred in finding and adjudging that Charley Coker was lawfully separated and divorced from Lizzie Coker, for that said findings and holdings are not sustained by the evidence and are contrary to the evidence. Third, that the court erred in finding and holding that Lake Moore acquired by purchase the interest of Colbert Coker in and to the allotment of Polly Coker by guardianship sale. The issues to be determined herein then are, Were Charley Coker and Lizzie Coker divorced, and was Polly Coker the legal wife of Charley at the time of her death? and, further, Was the guardianship sale of Colbert Coker's interest in the Polly Coker allotment a valid proceeding?

We will consider the first two assignments of error together. It is admitted that Colbert Coker was the son of Polly Coker and as such inherited an interest in her allotment, and it is upon the validity of the probate proceedings that the title to this interest depends, and as to the allotments of Lucy Coker and Jipsey Coker, the title to same depends solely upon the validity of the alleged divorce of Charley Coker from Lizzie and his marriage to Polly. The evidence shows that Lizzie and Charley Coker were husband and wife. That at the time of her marriage to Charley, Lizzie had a daughter named Polly. That Polly was just a little girl at that time and lived with Lizzie and Charley in the same house continuously after their marriage until she was about 15 years of age, when she and Charley moved into another house near by and began living together as husband and wife. However, the evidence on this point is conflicting, especially as to when the relation between Polly and Charley began; plaintiff in error contending that the relation between Polly and Charley was illicit and began while Charley and Lizzie were still husband and wife, and at a time when Charley was incapable of entering into the marriage relation. The evidence further shows that this relation between Polly and Charley continued up until the date of Polly's death in the year 1899, and that during this time, this plaintiff, Colbert Coker, and three other children, Gibson, Lucy, and Jipsey, were born to Polly and Charley.

The lower court found there was a separation and divorce between Charley and Lizzie under the Creek customs and a marriage under Creek custom of Charley and Polly,

and that the marriage of Charley and Polly was therefore legal and that the allotment of Polly descended under the Creek law in equal parts to Charley, her husband, and Gibson, Colbert, Lucy, and Jipsey, her children by Charley, and that upon the death of Lucy and Jipsey, their individual allotments, together with the interest they had inherited in their mother's allotment, descended under the Creek law to their father, Charley Coker; that R. J. Dixon was the owner of the one-fifth interest of Gibson Coker in his mother's allotment by virtue of a valid conveyance from said Gibson Coker, and that the defendant Lake Moore was the owner of the remaining four-fifths interest in said allotment by virtue of a deed from Charley Coker covering the three-fifths interest owned by him and a deed from Fred L. Strough, guardian of Colbert Coker, covering the one-fifth interest owned by said Colbert Coker. The court further found that Charley Coker was the sole heir of Lucy and Jipsey Coker, and therefore inherited their individual allotments, and that the defendant Lake Moore was the owner of same by virtue of proper conveyances from said Charley Coker.

Plaintiff in error Dixon having dismissed his appeal, the only question left for determination is as to the interest of plaintiff in error Colbert Coker in said allotments herein referred to. If the relation between Charley Coker and Polly was illicit and meretricious, then Lucy and Jipsey were illegitimate children and their putative father, Charley Coker, would not inherit any interest in their allotments, but same would have descended under the Creek law in force at the time of their death to Gibson and Colbert, the brothers of Lucy and Jipsey, and likewise Charley Coker would have been excluded from inheriting any interest in the allotment of Polly Coker and same would have descended to Lucy, Jipsey, Gibson, and Colbert in equal parts, and upon the death of Lucy and Jipsey, they having died intestate, unmarried and without issue, their interest would have descended to their brothers, Gibson and Colbert.

The record fails to show that Charley ever obtained any divorce from Lizzie other than an alleged custom divorce according to the custom of the Creek Tribe of Indians, and it is upon this alleged custom divorce of Lizzie and Charley and likewise upon a custom marriage of Polly and Charley that defendant in error relies. Divorce according to the custom of Indian tribes has been recognized by this court in Cyr v. Walker, 29 Okla. 281, 116 Pac. 931; Buck v. Branson, 34 Okla. 807, 127 Pac. 436; Coachman v. Sims, 36 Okla. 536, 129 Pac. 845: Palmer v. Cully, 52 Okla. 454, 153 Pac. 154; James v. Adams, 56 Okla. 450, 155 Pac. 1121. Plaintiff in error, however, contends that on October 2, 1881, the Creek Tribe of Indians approved a statute governing the granting of divorce, and divorce according to tribal custom was thereby extinguished, and cites in support thereof Davis v. Reeder, first decided by this court on October 2, 1923, and Proctor v. Foster. decided on October 23, 1923. An examination of the record in these cases discloses that rehearings were granted and the opinions upon which plaintiff in error relies were withdrawn and the opinions which became final in said cases are found in Davis v. Reeder, 102 Okla. 106, 226 Pac. 880, and Proctor v. Foster, 107 Okla. 95, 230 Pac. 753, in which opinions marriage and divorce according to Creek custom were recognized though same occurred subsequent to the enactment of the Creek statute of October 2, 1881. The first paragraph of the syllabus in Proctor v. Foster reads as follows:

"Marriages, contracted between tribal Indians according to the usages and customs of their tribe, at a time when the tribal government and relations are existing, will be upheld by the courts; in the absence of a federal law rendering invalid the laws and customs of the tribe.

"A dissolution of the marriage contract, according to such tribal laws, usages and customs, will be likewise upheld by the courts"

—following James v. Adams, supra, and Buck v. Branson, supra.

It is true that the Creek National Council in 1881 passed a law regulating marriages and divorces. It is admitted, however, that prior to that time custom marriages and divorces were valid they having no written law regulating same. It also appears that after the passage of the law of 1881 the same was given but little, if any, recognition and custom marriages and divorces continued generally among the tribe and were uniformly held by the members of the tribe to be valid and legal.

It is also admitted that during all the times herein under consideration, the Creek government existed as a separate and independent government, and it was therefore solely within its power to approve and follow their marriage and divorce statute of 1881 or to ignore it at their option. and if they saw fit to ignore it and to give full recognition and approval to custom marriages and divorce, then we believe it to be the duty

of this court, when we come to determine what constituted a valid marriage or divorce in the Creek Nation at the time their laws only on that subject were in force, to be controlled by what they as a distinct governing nation recognized as constituting a voluntary marriage or divorce.

There was evidence in this case tending to establish, and the court so found, that, at the time it was claimed Lizzie and Charley were divorced, there existed among them a custom marriage and divorce, which rendered any formal contract or ceremony unessential to the formation of the marriage relation or to the dissolution thereof. So mere meeting and cohabitation as husband and wife constituted a marriage, and the dissolution of such marriage was effected by a separation of the parties with the intention of no longer living together as husband and wife, which separation by mutual consent or by abandonment by one or the other was equivalent to an absolute divorce, and the parties thereafter were free to form other marital alliances. Of course this practice is repugnant to our ideas of ethics and morality and destroys the sanctity of the marriage relation in the light of our present day civilization, and is contrary to the law of the state, as it exists to-day, which applies alike to all citizens of the state, Indians as well as others. We must remember, however, that during all times herein under consideration, the Creek Tribe of Indians was not subject to the laws of any state, and no federal statute has been called to our attention, nor have we been able to find any, that renders invalid marriages and divorces between members of said tribe made in accordance with its usages and customs. On the other hand, there are numerous cases from this court as well as the Supreme Court of the United States and the courts of the other states of this Union upholding marriages and divorces contracted under facts and circumstances very similar, if not identical, to those of the case at bar. The theory of all such cases being, as was said in Bishop on Marriage, Divorce and Separation:

"It being for the highest good of the parties, of the children, and of the community that all intercourse between sexes in form matrimonial should be such in 'act, the law, when administered by enlightened judges, seizes upon all probabilities and presses into its service all things else which can help it in each particular case, to sustain the marriage, and repel the conclusion of unlawful commerce." Sections 77, 956, 958.

In this connection, we might add that from an exhaustive research and study of this question we are convinced that such a custom among the Indians at the time here considered, though same does not exist today, and would not now be tolerated, does not necessarily indicate a low moral standard among the Indians at that time, but, on the other hand, it is a well known fact that their usages and customs were just as sacred to them, unaccustomed as they were to the laws of the whites, and just as scrupulously observed in most instances as are the forms and ceremonies now prescribed for the entering into or dissolution of the marriage relation.

Written laws governing their domestic relations were an innovation at the time, and this court will give no greater force to the Creek divorce statute of 1881 than it had among Creeks. As hereinbefore stated, we are bound by the customs of the Creek Tribe and the construction they, themselves, have given their statutes.

In James v. Adams, supra, a dissolution of the marriage contract by Choctaw Indians according to their tribal custom, without court proceedings, was upheld, notwithstanding a Choctaw divorce statute very similar to the Creek divorce act of 1881 was in effect at the time; citing with approval Buck v. Branson, supra, wherein a custom of the Peoria Indians was involved. In the early case of Cyr v. Walker, 29 Okla. 281, 116 Pac. 931, which involved the Pottawatomie Indians, it was said:

"So long as Indians live together under the tribal relation and tribal government, they are subject only to the jurisdiction of Congress. The civil laws of the state do not extend to them. As long as they live in their tribal relations, they have been regarded by the government and by the courts as dependent governments, subject to the will of Congress and under the laws of the United States. They have been uniformly recognized as capable of regulating and managing their own tribal affairs, including their domestic relations; and domestic relations formed under their customs and laws have been treated by the courts as valid."

In Chancey v. Whinnery, 47 Okla. 272, 147 Pac. 1036, the identical question herein involved was under consideration, it being contended there, as here, that the parties not having been divorced as provided by the Creek statute of marriage and divorce approved October 22, 1881, one of the parties to the subsequent marriage was therefore incompetent to enter into the marriage relation, and same was therefore illicit and meretricious. There was no question there, as here, about the first marriage, in this case being the marriage between Charley

Coker and Lizzie Coker, having been lawfully entered into, but it was insisted there, as here, there being no proof of legal divorce, then it must follow that the subsequent attempted marriage, in this case being the relationship between Charley Coker and Polly, was meretricious and that any children born of such union were there ore illegitimate. In that case there was in evidence a statement by Billy that he had never applied for a divorce from Sardeeka in the district court of the Creek Nation, but there was no evidence that Sardeeka had not obtained a legal divorce from Billy. That is the exact situation here as to that question. Charley testified that he had never applied for a divorce from Lizzie, but there is no evidence as to whether or not Lizzie ever obtained a divorce from Charley. In this connection we quote as follows from the body of the opinion in that case:

"The authorities, with very general accord, are to the effect that, when a marriage in fact has been shown, the law raises a presumption that it is valid, casting the burden on him who questions it to establish its invalidity. This is one of the strongest presumptions known to the law. Among the many authorities sustaining the rule announced in Haile v. Hale, supra, see Coal Run Coal Co. v. Jones, 127 Ill. 379, 8 N. E. 865 96, Am. St. Rep. 322; Scott's Adm'r et al. v. Scott, 77 S. W. 1122, 25 Ky. Law Rep. 1356; Pittinger v. Pittenger, 28 Colo. 308, 64 Pac. 195, 89 Am. St. Rep. 193, note; Nixon v. Wichita Land & Cattle Co.. 84 Tex. 408, 19 S. W. 560; Smith v. Fuller, 138 Iowa, 91, 115 N. W. 912, 16 L. R. A. (N. S) 98, note; Alabama & V. R. Co. v. Blardsley, 79 Miss. 417, 30 South. 660, 89 Am. St. Rep. 660: Sparks v. Ross et al., 79 N. J. Eq. 99, 80 Atl. 932; Erwin, Adm'r., v. English, 61 Conn. 502, 23 Atl. 753; In re Rash's Estate, 21 Mont. 170, 53 Pac. 312, 69 Am. St. Rep. 649.

"Measured by the rule laid down. plaintiff failed in his proof. Every intendment of law is in favor of matrimony. The law is so positive in requiring a party who asserts the illegality of a marriage to take the burden of proving it that such requirement is enforced even though it involve the proving of a negative. When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of the proofs, the law raises a presumption of its legality, not only casting the burden of proof on the party objecting, but requiring him throughout and in every particular plainly to make the fact appear, against the constant pressure of this presumption, that it is illegal and void. Nixon et al. v. Wichita Land & Cattle Co.. 84 Tex. 408, 19 S. W. 560. The salutary rule so widely recognized and enforced should a fortiori find lodgment in the courts of this state, where the parties to the marriage relations are all full-blood Indians, unused and unaccustomed to the laws of the whites. and to whom written laws governing their domestic relations were innovations at the time."

Without regard, then, as to whether or not a divorce under Creek usages and customs was established, on the authority of this case and a long line of cases therein cited, a marriage by presumption was clearly established.

It would seem, therefore, that under the holdings of this court upholding marriages of tribal Indians contracted according to the usages and customs of their tribe at a time when the tribal government and relations were existing and likewise upholding a dissolution of the marriage contract according to such tribal laws, usages and customs, it becomes a question of fact to be determined from the evidence in this case as to whether or not the marriage relation between Lizzie and Charley Coker was dissolved according to the usages and customs of the tribe, and if so. was the alleged marriage between Polly and Charley contracted according to the usages and customs of their tribe?

The record in this case is very voluminous, and as heretofore stated ,the evidence upon this point is conflicting. From an examination of the findings of the court as disclosed by the record, it appears that the trial judge based his findings on this point principally upon the testimony of the witness S. B. McCuller, a full-blood Creek Indian. He was Polly's uncle, being a brother of her father, and testified as to the Creek custom, and as to just what that custom was there seems to be little or no conflict in the evidence, but as to just what these parties did, there is a sharp conflict. After considering all the testimony, the court stated that he was unwilling to bastardize these four children on the evidence before him, and resolved the doubt in favor of the marriage and the legitimacy of the children. By that finding we are bound, unless same is clearly against the weight of the evidence, even though we might have arrived at a different conclusion had we heard the testimony in the first instance.

In Disch v. Emmons et al., 102 Okla. 300, 229 Pac. 134, it was said:

"Where a trial court. exercising the powers of a chancellor, makes a special finding of facts as to each material issue made by the pleadings, a judgment based thereon will not be reversed by this court. unless such findings are against the weight of the evidence."

Also in Brown v. Privette. 109 Okla. 1,

234 Pac. 577, the first paragraph of the syllabus is as follows:

"In a case of purely equitable cognizance, this court will weigh the evidence produced in the trial court on appeal, and if it finds that the judgment of the trial court is not clearly against the weight of the evidence, it will not disturb said judgment."

Again, in Johnston v. Key, 110 Okla. 19, 235 Pac. 211, this court used the following language:

"In an appeal to this court from a judgment of the trial court in a case of purely equitable cognizance, where the record discloses competent and material evidence sufficient to make prima facie proof of every fact essential to the existence of the defense of the defendant on which the judgment is based, and the judgment is not clearly against the weight of evidence, the judgment will not be set aside on the alleged insufficiency of the proof offered."

In Baldridge v. Zigler, 103 Okla. 219, 229 Pac. 831, we find the following:

"In an equitable action the findings of the trial court should be sustained, unless it appears that his findings are clearly against the weight of the evidence.

"The findings of the trial court should be strongly persuasive, and should not be set aside unless this court can say in equity and in good faith that the conclusions reached by the trial court are clearly against the weight of the evidence."

In Travis v. Aaronson, 102 Okla. 210, 228 Pac. 958, the first paragraph of the syllabus is as follows:

"In an equitable proceeding this court will weigh the evidence, but the judgment of the trial court will not be set aside, unless against the weight of the evidence."

We have carefully reviewed this entire record and weighed the evidence, and we are unable to say that the judgment of the trial court is against the clear weight of the evidence, and in view of the holdings of this court in the cases above cited and numerous others to the same effect, we cannot reverse this judgment, but must affirm the same. See, also, Rhoads v. Rhoads, 105 Okla. 79, 231 Pac. 282; Turner v. Turner, 106 Okla. 261, 233 Pac. 1057; Miller v. Smith, 109 Okla. 203, 235 Pac. 225; Harrison v. Crume, 110 Okla. 87, 236 Pac. 388.

We come now to a consideration of the probate proceedings by which Lake Moore procured title to the interest of Colbert Coker in the allotment of Polly Coker.

Plaintiff in error contends that the appointment of Fred L. Strough as guardian was void and therefore the sale proceedings based thereon were void. Sections 1434 and 1435, C. O. S. 1921, are as follows:

"1434. If the minor is under the age of fourteen years, the county judge may nominate and appoint his guardian; if he is above the age of fourteen years, he may nominate his own guardian, who, if approved by the judge, must be appointed accordingly. And the county court, in appointing a guardian, is to be guided by the considerations named in section 6584.

"1435. If the guardian nominated by the minor be not approved by the judge, or if the minor resides out of the state, or if, after being duly cited by the judge, he neglects for ten days to nominate a suitable person, the judge may nominate and appoint the guardian, in the same manner as if the minor was under the age of fourteen years."

Plaintiff in error's contention that the appointment of guardian was void is based upon the fact, as he alleges, that the court did not cause notice to be served upon the minor, who was over 14 years of age, and thus give him an opportunity to nominate his guardian as provided in section 1434, C. O. S. 1921, supra, and that he had no notice of any kind of said guardianship proceedings. The record discloses that the petition for appointment of guardian was filed by Lake Moore, one of the defendants herein, purporting to be a friend of the minor; that same stated that Colbert Coker was a minor 18 years of age, that the next of kin and person having the care of Colbert Coker was his half-sister, Leah Roberts, of Weleetka, with whom he lived, and Charley Coker, his father, who was a fugitive from the law. The record further disclosed that the county judge made an order setting said petition down for hearing on the 7th day of May, 1912, and directed notice to be given by serving copy of notice of hearing said petition on Leah Roberts at least five days before date of hearing and by publishing copy of said notice in the Okemah Independent on May 2, 1912, addressed to Charley Coker. The court's order appointing guardian was entered May 7, 1912, and it purported to set out the character of notice given, showing that the notice as directed by the court in its order of April 27th was given to Leah Roberts and Charley Coker. The record fails to show any notice to the minor, Colbert Coker.

Defendants in error seem to concede in their brief that such notice to Colbert Coker was necessary before a valid appointment could be made, but contend that unless the record affirmatively shows that notice was not given, it must be presumed that it was

duly given; further contending that merely because notice was shown to have been given the persons in whose custody the minor was alleged to be, and to the father by publication, the court cannot assume that no notice in fact was given to Colbert Coker. With this contention, we agree. But the record in this case does affirmatively show just what notice was ordered to be given by the court, just what notice was given, and just how it was given and to whom. That it was given as the court directed is clearly shown by the order appointing the guardian. It would seem, therefore, that this state of facts precludes any presumption as to notice of any kind being given to Colbert Coker.

In the case of Mullin v. Hawkins, 97 Okla. 30, 222 Pac. 697, this court said, quoting from Pettis v. Johnston, 78 Okla. 277, 190 Pac. 681:

"If it appear positively that process was served in a particular mode, no other and different service will be presumed."

Continuing, the court said:

"And while in this case the record does not disclose positively the manner of process, but it does disclose the attempted services of process relied upon, and the fact that no contention is made that any other kind of service or process was attempted or made we think it fair to presume that the court relied upon the instrument denominated a waiver and nomination of guardian, signed 'Vedia S.' as being the only notice or character of service relied upon by the court in this case to obtain jurisdiction, and that in our judgment being insufficient, we think it decisive of the rights of the parties in this case and make no further mention of the errors complained of relative to the further proceedings in the guardianship matter of the sale and confirmation of the deed to the land of the defendant in error.

"The appointment of guardian being void, all orders and acts based thereon would necessarily be null and void and of no force or effect, and hence we recommend that the judgment of the trial court be affirmed."

This is the exact situation as disclosed by the record in this case. It is clear that the notice relied upon by the court in appointing Strough as the guardian of Colbert Coker was the notice which it directed in its order should be given and which the order appointing the guardian recited was given. It cannot be presumed, when the county court sets out in the order appointing guardian the character of notice given of the hearing, that any other or different notice was given, especially when the order appointing the guardian shows that the identical notice directed in the order setting the petition for appointment of guardian down for hearing was given. Intervener attaches to his petition copies of the probate proceedings and they were introduced in evidence without objection except as to their competency.

No attempt was made to show that Colbert Coker had notice of the proceedings or was given an opportunity to nominate his own guardian or that any notice was given other than that shown by the probate proceedings as introduced by the intervener. The court evidently acted on the theory that the notice as stated in the order appointing guardian was sufficient, and as was said in Mullin v. Hawkins, supra, we think it a fair presumption that no other notice or service was attempted. It is clear then, that Colbert Coker had no notice of the appointment of the guardian, and was not given an opportunity to nominate his guardian as required by the statute.

It was held in Given v. Pollock, 96 Okla. 25, 219 Pac. 898, that the right of a minor 14 years of age or over to select his guardian is absolute, the only discretion of the county judge being as to whether the nominee is a proper and suitable person and a resident of the state, quoting with approval from In re Kirkman's Estate, 168 Cal. 688, 144 Pac. 745, wherein it was said:

"The whole scheme contemplates the absolute right of the minor to have a guardian of his own selection after he is 14 years of age, provided always he selects a person who is, in the judgment of the court, a suitable person to act as guardian. The discretion of the court can be exercised only in the determination of the question whether the nominee is a 'suitable person'."

Under the record in this case this absolute right was denied the minor.

We, therefore conclude, upon the authority of Mullin v. Hawkins, supra, and the cases therein cited, that the appointment of the guardian in this case was void and subject to the attack made upon it, and the orders and acts based thereon are necessarily null and void and of no force and effect, and the judgment sustaining the probate proceedings relied upon will have to be reversed. To this extent, therefore, the judgment of the district court of Creek county is reversed, and in all other respects same is affirmed.

This cause is therefore remanded to the district court of Creek county, with directions to modify its judgment herein to the extent of decreeing to the intervener, Colbert Coker, an undivided one-fifth interest in the allotment of Polly Coker, deceased,

and to take such further proceedings herein as will accord with right and justice between the parties.

NICHOLSON, C. J., and HARRISON, MASON, LESTER, CLARK, and RILEY, JJ., concur.

Note.—See under (1) 31 C. J. p. 487 §25; 38 C. J. p. 1278 §4; 14 R. C. L. p. 122; 3 R. C. L. Supp. p. 175. (2) 31 C. J. p. 487 §25. (3) 31 C. J. p. 487 §25; 2 R. C. L. 194; 1 R. C. L. Supp. p. 433; 4 R. C. L. Supp. 90; 5 R. C. L. Supp. 79. (4) 28 C. J. p. 1074 §38. (5) 28 C. J. p. 1074 §38; anno. 1. A. L. R. 919.